# United States Court of Appeals
## For the First Circuit

No. 16-1637

MARIBEL MALDONADO-CÁTALA,

Plaintiff, Appellant,

v.

MUNICIPALITY OF NARANJITO; ORLANDO ORTIZ-CHÉVRES, in his individual and official capacity as Mayor of Municipality of Naranjito; MARIALIS FIGUEROA-NEGRÓN, in her individual and official capacity as Director of the Human Resources Office of the Municipality of Naranjito; JOSÉ TOMÁS RODRÍGUEZ-VÉLEZ, in his official and individual capacity as Director of the Municipal Emergency Management Office; JOSÉ AMUARY FIGUEROA, in his official and individual capacity as Interim Chief of Field Operations for the Emergency Management Office; HIRAM BRISTOL-COLÓN, in his official and individual capacity as Former Director of the Municipal Emergency Management Office,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Bruce J. McGiverin, Magistrate Judge]

Before

Howard, Chief Judge,
Lipez and Thompson, Circuit Judges.

Luis A. Rodríguez Muñoz, with whom Landrón Vera, LLC, Eduardo A. Vera Ramírez, and Eileen Landrón Guardiola were on brief, for appellant.
Efraim A. De Luna-Colon, with whom Gonzalez-Mendez Law Office and Vivian Ivette Gonzalez Mendez were on brief, for appellee

Municipality of Naranjito and individual appellees in their official capacity.

Luis R. Román-Negrón, Solicitor General, with whom Susana I. Peñagarícano-Brown, Assistant Solicitor General, was on brief, for individual appellees in their individual capacity.

November 21, 2017

**LIPEZ**, **Circuit Judge**. Appellant Maribel Maldonado-Cátala ("Maldonado") claims that, over a period of years, she faced abusive treatment from colleagues and superiors in the Emergency Management Office ("EMO") of the Municipality of Naranjito. She brought this suit alleging violations of federal and Commonwealth anti-discrimination laws, asserting that the defendants' actions were based on gender, and were in retaliation for her complaint about a superior's sexual harassment. The district court granted summary judgment for the defendants. On appeal, Maldonado challenges only the dismissal of her claims premised on a hostile work environment. Having carefully reviewed the record, we take a different path but ultimately agree with the district court's conclusion that these claims are not viable. Hence, we affirm its judgment.

## I. Background

### A. The Facts

We present the facts in the light most favorable to appellant, consistent with record support. See Alfano v. Lynch, 847 F.3d 71, 74 (1st Cir. 2017).

#### 1. Maldonado's Employment and First Leave

Maldonado began working in the EMO as an emergency medical technician in 2008, responding via ambulance when medical or other emergency assistance was needed. After suffering a work-related accident, Maldonado took leave from July 8, 2010 until

April 3, 2012. In September 2010, while on leave, she accompanied a co-worker to meet with the Municipality's Director of Human Resources, Marialis Figueroa-Negrón ("Figueroa-Negrón" or the "HR director"), to discuss sexual harassment by the EMO director, Hiram Bristol-Colón ("Bristol"), against several female employees. During that meeting, Maldonado reported comments made to her not only by Bristol, but also by another EMO employee, José Amuary Figueroa-Nieves ("Figueroa-Nieves"), who made crude jokes about Maldonado's sexual orientation. Maldonado's co-worker, Jose Luis Hernandez Rivera ("Hernandez"), testified in his deposition that Figueroa-Nieves and at least one other EMO employee repeatedly used slurs, such as "machito" (roughly translated as "manly") to refer to Maldonado, and he described the situation as "like a battle" because she was being attacked "all the time."

Shortly after the September 2010 meeting, the Municipality hired an attorney to investigate the complaint against Bristol, and Maldonado was one of the employees interviewed. By the end of October 2010, the attorney had issued a report finding that Bristol had engaged in misconduct and sexual harassment, and recommending his removal from his position. At the request of the mayor, Orlando Ortiz-Chévres, Bristol resigned from his trust position as EMO director. For the next several months, Ramón Vázquez Baez ("Vázquez"), the Municipal Police Commissioner, also served as interim EMO director.

Following the Bristol investigation, Maldonado was the subject several times of derogatory comments posted on Facebook by one or more individuals, using pseudonyms, referring to her involvement in the matter. She highlights a Facebook message sent to her personally at 10:46 PM on November 1, 2010, in which she was called a "nasty lesbian," "whore," "snake," and "dike." The message further stated: "I will see you fall you dirty lesbian and every one of you one by one what you did to that man the one from emergency management . . . remember that you have children that by the way the boy is gay and the girl is a lesbo . . . ."

Understandably alarmed by this message, Maldonado filed a police report the next morning that prompted an investigation. Although the law enforcement inquiry indicated that the message was sent from within the Municipality, and possibly from the EMO or municipal police department, the police were unable to identify the sender within the applicable one-year limitations period for the misdemeanor that could have been charged based on the message. Hence, in late 2011, the department terminated its investigation. The primary police investigator, Officer Jackeline Candelaria Curbelo ("Candelaria"), turned over her file to Maldonado, reporting that "things had gotten complicated" and that "[t]hey

used the municipality's computers and the internet to send you this message."[1]

Meanwhile, Maldonado also had reported the messages shortly after she received them to Figueroa-Negrón, the HR director, who told her that she would pursue the matter within the department after the police investigation and said "when the time[] come[s] we will punish them." When Maldonado obtained the police file in late 2011, she offered the documents to the mayor, who initially expressed skepticism about investigating "a fake page," but then instructed Maldonado to deliver the materials personally to Figueroa-Negrón when she returned from maternity leave in early 2012. In February 2012, Maldonado sent a letter to the mayor requesting an administrative investigation. Maldonado suspected Figueroa-Nieves, whom Vázquez, the Municipal Police Commissioner and EMO interim director in late 2010 and early 2011, had put in charge of the office's day-to-day operation while he handled police

---

[1] In her deposition, Candelaria stated that she did not know if the message could be traced back to a specific computer within the Municipality. She explained that the police had determined that the holder of the internet account at issue was the Municipality of Naranjito, that the "service was installed at the Emergency Management Office facilities," and that the phone numbers associated with the account belonged to the EMO and the Municipality's police department. As she was answering questions at the deposition, however, she discovered that two different account numbers were listed in the letter sent by the internet service company to the police. Candelaria said she did not know whether the identifying information provided was for the correct, or incorrect, account number.

work.  In that role, Figueroa-Nieves would have had access to the EMO computer identified as a possible source of the message.  To Maldonado's knowledge, no internal investigation took place.

## 2. Maldonado's Work Experience Post-Leave

Maldonado returned to work in April 2012.  Although the doctor for the State Insurance Fund told her that her back sprain was not fully healed at that point, and she should not yet return to work, he nonetheless gave her the required form when Maldonado explained that she had been denied an additional six-month leave and could not afford to lose her job.[2]  The form reported that she would continue receiving treatment while working.

Just before resuming her position, Maldonado met with Figueroa-Negrón and the EMO director appointed in February 2011, José Tomás Rodríguez Vélez ("Rodríguez"), to inform Rodríguez

---

[2] At one point in her deposition, Maldonado stated that she was denied leave "as soon as they received notification of the police complaint and investigation."  That assertion, however, is belied by more specific evidence in the record.  Maldonado testified that she told her superiors in late 2010 that she had filed a police complaint after the November 1 Facebook message, and she also testified that she "maintained contact continuously" with the HR director and mayor's office during the course of the police investigation.  Meanwhile, three times during the one-year period from December 2010 through December 2011, she was granted additional leave.  See App'x at 270-71 (requests in August and June 2011, and approval through December 31, 2011); id. at 268-69 (request for three-month extension, dated December 11, 2011, and approval of leave through March 31, 2012).  Maldonado also acknowledges that the municipality is obligated to retain a position for an employee on medical leave only for one year, meaning that she could have been terminated in July 2011.

about the Facebook-related investigation involving EMO employees "so that he knew and understood and [could] try not to make us work the same schedules and so that he [could] be [on the] look out." They also discussed Maldonado's need to reactivate her professional licenses, which had lapsed while she was out, so she could be assigned paramedic duties. According to Maldonado, Rodríguez told her "that since my licenses were past due, that he needed a janitor for the office."

Rodríguez and Figueroa-Negrón initially gave Maldonado two months to renew her licenses, but Maldonado testified that they "understood that it wasn't humanly possible to comply with all those requirements in two months." They told her there would be no problem if she "kept bringing them certifications" showing that she was moving toward fulfilling the licensing requirements.[3] For the first couple of months after her return, Maldonado was assigned exclusively to the EMO office answering phones.[4] She attributed that placement to "my condition and they saw that my licen[s]es were not up to date."

---

[3] Maldonado testified that, by November 2012, she had provided documentation for CPR training, sign language instruction, and the Public Service Commission license for driving an ambulance. She had still not taken the practical exam administered by the Medical Emergency Technician Examination Board, which was offered infrequently.

[4] Maldonado reports no further mention of the janitorial position.

Maldonado testified that, at the time she was assigned to phone duty, she was the only paramedic who lacked full licensing who was not allowed to work in the field. Although it had been common in the past for EMO employees to perform paramedic work without full licensing, an ongoing office restructuring process sought to bring all employees into compliance with the licensing requirements. Nonetheless, the other employees who had not yet fulfilled the requirements continued to go out on emergency calls. Maldonado further testified that male employees had received reimbursement for their licensing costs before her accident and leave, but she had been denied financial assistance when she requested it upon her return to work in 2012. She acknowledged that the reimbursement rules had changed in the interim, but she followed the new procedure and first sought approval from the EMO director, who denied her request.

During her first few months back on the job, Maldonado received favorable reviews from her supervisor. On a day in mid-June, Maldonado was assigned to an ambulance for field duty because the paramedic originally designated for that assignment was absent. In her brief, she notes that "[t]his was done despite her physical limitations and previous injuries." Thereafter, Maldonado was assigned shifts both at the call center and driving ambulances. She testified that it was difficult for her to be "out on the street, . . . with the gurney and the things you have

to do, so my back would get injured."  In November 2012, she had another work-related accident that resulted in an extended leave. A year later, in November 2013, the mayor told her she was being terminated because the one-year statutory period for reserving her job had ended.

**B. Legal Proceedings**

While still employed, Maldonado filed a charge on May 24, 2012 against the Municipality with the Equal Employment Opportunity Commission ("EEOC") claiming sex-based discrimination and retaliation.  She alleged that (1) she and others were harassed after they participated in the investigation against Bristol, (2) she returned to work "under coercion," (3) the Municipality discriminated against her based on her gender in refusing to reimburse her licensing costs and allowing males to work as paramedics without the required certifications, and (4) the municipality "allowed its employees to use government equipment to smear my image as a woman, alluding to falsehoods because of my sexual orientation."  She specifically alleged that Figueroa-Nieves had on numerous occasions publicly directed homophobic epithets at her.

The EEOC found no unlawful conduct directed against Maldonado, instead concluding that the Municipality "ha[d] tried to mediate and address all the concerns of the Employee."  The agency gave Maldonado a right-to-sue letter.  In July 2013, she

filed this action against the Municipality and various officials in their official and individual capacities: Ortiz-Chévres (the mayor), Figueroa-Negrón (the HR Director), Rodríguez (the EMO Director), Figueroa-Nieves (the co-worker whom she claims routinely harassed her at work and sent the Facebook message), and Bristol (the EMO Director who was terminated). Maldonado claimed, inter alia, that the defendants discriminated against her based on her gender and sexual preference, and exposed her to a hostile work environment and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17, and in violation of various provisions of Puerto Rico law.

The defendants moved for summary judgment, which the district court initially granted in part and denied in part.[5] In its first ruling, the court rejected Maldonado's retaliation claims based primarily on her failure "to establish a causal link between her termination in 2013 and her participation in the investigation against Bristol in 2010, which is the only protected conduct she alleges formed the basis for retaliation." Maldonado-Cátala v. Municipality of Naranjito, 255 F. Supp. 3d 300, 320 (D.P.R. 2015). The court also granted summary judgment for the

---

[5] The district court addressed only Maldonado's hostile work environment and retaliation claims because Maldonado did not present developed arguments on any other theory. See Maldonado-Cátala v. Municipality of Naranjito, 255 F. Supp. 3d 300, 310 n.7 (D.P.R. 2015).

individual defendants on the gender- and retaliation-based hostile work environment claims because Title VII does not provide for individual liability, id. at 321-22, but it allowed those claims to proceed against the Municipality. The court also denied summary judgment on multiple state law claims against all defendants.

On reconsideration, the district court dismissed all of the claims.[6] In its second ruling, the court held inadmissible a significant portion of the evidence on which it previously had relied to conclude that Maldonado's sex-based hostile work environment claims could proceed. It concluded that the statements Maldonado attributed to male co-workers who were allowed to function as paramedics -- i.e., that they also lacked the required licenses -- were inadmissible as hearsay. Maldonado-Cátala v. Municipality of Naranjito, No. 3:13-cv-01561-BJM, 2016 WL 1411355, at *2 (Apr. 11, 2016). In addition, the court held that Maldonado's evidence was insufficient to permit a reasonable jury to find that the Facebook messages originated from a computer in the EMO. Id. The court further noted that, in any event, Maldonado could not prove a hostile work environment in reliance on those messages because she was on leave at the time they were sent and

---

[6] Following the initial summary judgment decision, the Municipality moved for reconsideration, and both the Municipality and the individual defendants moved for judgment on the pleadings.

she reported no incidents of harassment once she returned to work in April 2012.  Id. at *3.

The district court similarly found Maldonado's retaliation-based hostile environment claim unsupported by the proffered evidence.  The court viewed Rodríguez's "antagonistic statement" about giving Maldonado janitorial duties as, at most, an isolated remark.  Id.  The court further held that, "more importantly," the record lacked evidence that Rodríguez was aware of Maldonado's participation in the Bristol investigation, and it observed that "the temporal proximity between the sexual harassment investigation in October 2010 and Rodriguez's statement in April 2012 further militates against a causal link."  Id. at *4.

The court also concluded that, given the "evidentiary shortcomings" concerning the defendants' alleged conduct in 2012 (the unequal treatment and hostile remark), those actions could not serve as anchoring incidents that would bring conduct prior to November 2011 -- i.e., the Facebook posts and workplace epithets -- within the applicable Title VII statute of limitations.  Id. As to the Commonwealth claims, the court held that they failed on the same evidentiary grounds, were time-barred, or suffered from multiple defects.  Id. at *5.

On appeal, Maldonado argues that the district court erroneously concluded that she failed to show a genuine factual

dispute as to whether she experienced a hostile work environment based on gender and retaliatory motivation, and also erred in finding those claims to be untimely.  She asserts that, given the timeliness of her federal claims, her claims under Puerto Rico Law 17 and Law 69 also should be reinstated.[7]

## II. Discussion

### A. Standard of Review

We review a district court's grant of summary judgment de novo, taking the evidence in the light most favorable to the non-moving party and drawing all inferences in her favor.  See, e.g., Ahmed v. Johnson, 752 F.3d 490, 495 (1st Cir. 2014). "Summary judgment is inappropriate if the evidence 'is sufficiently openended to permit a rational fact finder to resolve the issue in favor of either side.'" Id. (quoting Gerald v. Univ. of P.R., 707 F.3d 7, 16 (1st Cir. 2013)).  To survive a motion for summary judgment, however, the non-movant must "demonstrat[e], through submissions of evidentiary quality, that a trialworthy issue persists."  Cruz v. Mattis, 861 F.3d 22, 25 (1st Cir. 2017) (quoting Iverson v. City of Boston, 452 F.3d 94, 98 (1st Cir. 2006)).  We are not limited by the district court's reasoning, but may affirm a grant of summary judgment "on any ground made manifest

---

[7]  Maldonado does not discuss in her brief a claim of retaliation except in the context of a retaliatory hostile work environment.  Any such additional retaliation-based claim is therefore waived.

- 14 -

by the record." Geshke v. Crocs, Inc., 740 F.3d 74, 76-77 (1st Cir. 2014).

## B. Statute of Limitations

Maldonado filed her EEOC discrimination charge without first filing a charge with the Commonwealth Department of Labor, and it is undisputed that the limitations period for her claims is thus 180 days. See 42 U.S.C. § 2000e-5(e)(1).[8] That 180-day period extends back to November 26, 2011,[9] and, accordingly, any unlawful employment practice that occurred earlier is not actionable on its own. See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 109 (2002) ("A claim is time barred if it is not filed within these time limits."). However, under the continuing violation doctrine, "a plaintiff may obtain recovery for discriminatory acts that otherwise would be time-barred so long as a related act fell within the limitations period." Tobin v. Liberty Mut. Ins. Co., 553 F.3d 121, 130 (1st Cir. 2009).

---

[8] A plaintiff must file an administrative complaint with the EEOC within 180 or 300 days after the alleged unlawful employment practice occurred. The 300-day filing deadline applies when the plaintiff has filed first with a state or local agency. See 42 U.S.C. § 2000e-5(e)(1).

[9] Pursuant to Title VII's filing requirements, the calculation of Maldonado's limitations period begins with the filing of her EEOC complaint on May 24, 2012. The applicable procedure then calls for counting back 180 days to determine the earliest possible date that an unlawful employment action could have occurred and still be actionable. The parties do not dispute that, based on the 180-day calculation here, Maldonado must show an unlawful employment practice that occurred on or after November 26, 2011.

- 15 -

We have described a hostile work environment as "[t]he classic example of a continuing violation" because the actionable wrong consists of an accumulation of "'individual acts that, taken together, create the environment.'" Id. (quoting Ledbetter v. Goodyear Tire & Rubber Co., 550 U.S. 618, 638 (2007)). Hence, all of the "component acts" alleged in a hostile work environment claim may be considered in determining liability even if they occurred outside the limitations period. Id. (quoting Morgan, 536 U.S. at 117); see also Morales-Tañon v. P.R. Elec. Power Auth., 524 F.3d 15, 18-19 (1st Cir. 2008) (noting that the continuing violation doctrine "allow[s] suit to be delayed until a series of wrongful acts blossoms into an injury on which suit can be brought" (quoting Limestone Dev. Corp. v. Vill. of Lemont, 520 F.3d 797, 801 (7th Cir. 2008)).

Maldonado asserts that she was subjected to abusive working conditions throughout her employment at the EMO, starting with the homophobic insults and jokes directed at her prior to her first medical leave, followed by the Facebook posts after she complained about Bristol during that medical leave, and continuing with her treatment after she returned to work in April 2012 from her extended leave. The evidence that Maldonado was the target of persistent offensive comments by Figueroa-Nieves and Bristol from early in her employment might support a finding that she faced a cognizable abusive environment before the limitations cutoff date.

Whether the Facebook harassment in late 2010 is properly included as part of that environment is debatable, however, given that she was on extended leave at that time.[10]  Regardless, all of this conduct is off limits unless Maldonado can surmount the time-bar for actions that occurred before the end of 2011.  Consistent with the precedent described above, we may consider the defendants' alleged behavior in the early years of Maldonado's employment only if at least one of the incidents that occurred after November 26, 2011 -- the earliest date within the limitations period -- constitutes part of the same hostile work environment as the alleged wrongful conduct that preceded that date.

We thus next consider whether a reasonable jury could find, based on the record before us, that Maldonado experienced instances of harassment after November 26, 2011 that were part of an ongoing gender-based or retaliatory hostile work environment.

_____

[10] Maldonado correctly notes that our precedent permits consideration of non-workplace conduct "to help determine the severity and pervasiveness of the hostility in the workplace" and to establish the unlawful motivation.  Crowley v. L.L. Bean, Inc., 303 F.3d 387, 409 (1st Cir. 2002); see also O'Rourke v. City of Providence, 235 F.3d 713, 724 (1st Cir. 2001) (noting that plaintiff's abusive treatment, causing her to be a "nervous wreck" at work, included crank phone calls received at home).  In those cases, however, the plaintiffs' employment was active, and the outside incidents allegedly affected the plaintiffs' contemporaneous working conditions.  Here, by contrast, Maldonado had been on leave for months at the time of the Facebook messages, and she did not return to work for more than a year afterwards.  Given our disposition, we need not consider the applicability of the "non-workplace" precedent to the different circumstances here.

## C. Title VII Workplace Harassment

### 1. The Requisite Abusive Conduct

To succeed with a hostile work environment claim, a plaintiff must show harassment "sufficiently severe or pervasive so as to alter the conditions of [her] employment and create an abusive work environment." Pérez-Cordero v. Wal-Mart P.R., Inc., 656 F.3d 19, 27 (1st Cir. 2011). The challenged conduct must be "both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and [the plaintiff] in fact did perceive it to be so." Id. In performing this inquiry, "a court must mull the totality of the circumstances, including factors such as the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfere[d] with an employee's work performance." Noviello v. City of Boston, 398 F.3d 76, 92 (1st Cir. 2005) (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1998)); see also O'Rourke v. City of Providence, 235 F.3d 713, 729 (1st Cir. 2001). The harassment also must stem from an impermissible motivation, which in this case is alleged to be both gender and retaliation. See Noviello, 398 F.3d at 84, 88

(recognizing hostile environment claims alleging sexual and retaliatory animus).[11]

### 2. Maldonado's Work Environment after November 26, 2011

The timely conduct that Maldonado alleges to support her hostile work environment claim consists primarily of the following: (1) the defendants' failure to investigate the Facebook postings at the conclusion of the police investigation in December 2011; (2) the "coercion" that caused her to return to work before she was fully healed from her injuries, along with Rodríguez's comment suggesting that she would be assigned janitorial duties; and (3) the unequal treatment she experienced, both in her work assignments and in the refusal to reimburse her licensing costs.[12]

---

[11] We have identified six elements that a plaintiff must establish to succeed with a gender-based hostile work environment claim under Title VII. See, e.g., Ponte v. Steelcase, Inc., 741 F.3d 310, 320 (1st Cir. 2014); see also 42 U.S.C. § 2000e-2(a) (barring sex-based discrimination). In addition to proving that she experienced (1) unwelcome harassment that was (2) severe or pervasive, and (3) both objectively and subjectively offensive, the plaintiff must show (4) membership in a protected class, (5) that the harassment was motivated by sex, and (6) a basis for employer liability. See Ponte, 741 F.3d at 320. To make a prima facie showing of a retaliation-based hostile work environment in violation of Title VII, the gender-based requirements are replaced by the need to show a causal link between protected activity and the hostile environment. See Noviello, 398 F.3d at 88-90; see also 42 U.S.C. § 2000e-3 (barring retaliatory discrimination).

[12] Maldonado also states that she was subject to "name calling regarding her sexual preference," which her co-worker, Hernandez, described as a four-year "battle." However, neither Maldonado nor Hernandez point to incidents that occurred after the Facebook message in November 2010. Hernandez said he reported the persistent insults to Bristol, but that report necessarily

A careful review of the record reveals that none of these alleged mistreatments, in isolation or taken together, has sufficient grounding to support a jury finding that Maldonado suffered "severe or pervasive" harassment that "alter[ed] the conditions of [her] employment and create[d] an abusive work environment" extending into the relevant time period. Pérez-Cordero, 656 F.3d at 27. First, Maldonado does not explain how her daily work life was impacted by her superiors' failure to investigate the Facebook posts following the police investigation.

_____

occurred before Bristol's termination in late October 2010. Hence, at best, Maldonado offers only conclusory allegations of verbal attacks within the limitations period, which we do not consider. See, e.g., Nieves-Romero v. United States, 715 F.3d 375, 378 (1st Cir. 2013) ("To be genuine, a factual dispute must be built on a solid foundation -- a foundation constructed from materials of evidentiary quality.").

In addition, under longstanding First Circuit precedent, harassment based on Maldonado's perceived sexual orientation is not actionable under Title VII. See Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 259 (1st Cir. 1999). Other circuits have recently been reconsidering similar precedent. See Hively v. Ivy Tech. Cmty. Coll. of Ind., 853 F.3d 339, 340-41 (7th Cir. 2017) (en banc) (overturning prior Seventh Circuit precedent and holding that "discrimination on the basis of sexual orientation is a form of sex discrimination" under Title VII); see also Zarda v. Altitude Express, 855 F.3d 76, 80 (2d Cir. 2017) (per curiam) (stating that a three-judge panel lacks authority to revisit Second Circuit precedent equivalent to Higgins), reh'g en banc granted, No. 15-3775 (May 25, 2017). Much of the verbal harassment Maldonado describes falls within the sexual orientation category. Given our disposition, we have no occasion to revisit our Title VII sexual orientation precedent. Nor need we decide whether enough of the comments could be characterized as gender-based, rather than based on sexual orientation, to support a Title VII hostile environment claim under our current caselaw.

We do not doubt that the inaction was upsetting to Maldonado, but without more, a jury could not reasonably view the lack of follow-through as on-the-job harassment that altered her working conditions.

Second, the allegation of coercion and the janitor comment both lack probative force. Although Maldonado claims that she was compelled to return to work prematurely because she was denied additional leave, she previously had been granted a series of leaves, spanning twenty months, and acknowledges that she was subject to termination after she had been out of work for a year. To be sure, a jury could find that Maldonado felt forced to return to work to preserve her job. Yet the mayor's mere refusal to extend her leave beyond March 31, 2012 -- again, without more -- cannot reasonably be viewed as an act of workplace harassment. Likewise, Maldonado's attempt to characterize as an instance of abuse Rodríguez's comment that the EMO needed a janitor -- a remark neither reiterated nor acted upon -- does not have enough evidentiary significance to provide the basis for a hostile work environment claim. See Faragher, 524 U.S. at 788 ("[O]ffhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." (internal quotation marks omitted)). Absent follow-up by Rodríguez, that untoward comment is inconsequential and not reasonably characterized as workplace abuse.

Third, the record does not substantiate Maldonado's allegation of unequal treatment. Her assertion of discrimination in work assignments is premised on her exclusion from ambulance shifts while men with equal or lesser qualifications were assigned field duty.[13] Yet, approximately two months after she returned to work -- when she had reacquired CPR and ambulance driving licenses, but had not yet satisfied all of her paramedic licensing requirements -- Maldonado was assigned shifts both at the call center and in ambulance crews. Importantly, despite her insinuation that work at the call center was inferior to street work, she testified that ambulance assignments were difficult for her because of her ongoing physical problems. In other words, Maldonado at times indicated that being assigned to field duty, rather than her exclusion from it, was the problem.

Given her own inconsistent depictions of the work she wanted, and the evidence that she was assigned ambulance duties before she was fully licensed, a reasonable factfinder could not conclude that the defendants created an abusive work environment by denying Maldonado paramedic tasks that were given to less-

_____

[13] We use various terms -- including "ambulance shifts," "field duty," and "street work" -- to describe the active, out-of-office duties that Maldonado claims she was denied, all of which are intended to distinguish such assignments from the sedentary work she performed at the call center.

- 22 -

credentialed males.[14]  Relatedly, Maldonado acknowledges that, despite the two-month deadline given to her for reactivating all of her licensing, she was allowed to take more time so long as she was making incremental progress.  That flexibility further undermines the allegation of an abusive environment.  As to reimbursement for the costs of licensing, Maldonado based her allegation of differential treatment solely on her experience before she went on leave in 2010, when Bristol was the EMO director, and offered no evidence that her male colleagues were treated differently by Rodríguez, the EMO director who denied her request in 2012.  Indeed, she quoted Rodríguez as saying that, regardless of what the prior director had done, "he was not going to do it."  On this evidence, a factfinder could not find unequal treatment that amounted to harassment.

We recognize that "[t]he accumulated effect" of behaviors that individually fall short may, taken together, constitute a hostile work environment.  O'Rourke, 235 F.3d at 729.  In addition, we must consider the post-leave actions in the context of Maldonado's experiences prior to the limitations period.  Even taking a broad view, however, the evidence Maldonado presents is

---

[14] We note that the district court based its second summary judgment ruling, in part, on its view that the statements of Maldonado's male co-workers about their lack of licensing were inadmissible as hearsay.  We need not address that holding because, as described above, Maldonado's assertion of unequal treatment fails even if we consider her co-workers' statements.

inadequate to allow a finding that the defendants' post-leave conduct contributed to an ongoing hostile work environment reflecting gender discrimination or retaliatory animus. With her conceded physical limitations, there is nothing objectively oppressive in her depiction of the assignments she was given. The unsubstantiated reimbursement allegation and the single comment from Rodríguez do not change the landscape.

Moreover, even if any of the circumstances she faced after returning to work could have been characterized as abusive, Maldonado offers no evidence that would permit a jury to attribute her treatment to the gender-based or retaliatory motivation that fueled the time-barred harassment she suffered in the fall of 2010. See, e.g., Alvarado v. Donahoe, 687 F.3d 453, 459 (1st Cir. 2012) (noting the need for "a causal connection" between protected conduct and alleged retaliatory actions); Pérez-Cordero, 656 F.3d at 27 (stating that the plaintiff must show, inter alia, "that the harassment was based upon sex"). Although Maldonado believes that Figueroa-Nieves was responsible for the Facebook posts, and she claims that he also was the primary source of the earlier insults and jokes, she does not cite any verbal attacks or other harassment by him within the limitations period.[15] Rodríguez, the EMO

---

[15] To the contrary, Maldonado admitted that, a month or so before Figueroa-Nieves received notice of this lawsuit -- i.e., in mid-2013 -- he loaned her $200, which she repaid, and that the conversations between them were "cordial." She also admitted that,

director, was not with the agency during the earlier period; he took over as director in February 2011. Even if he knew about her complaint against Bristol, there is no evidence of a retaliatory (or gender-based) motivation for his actions in assigning duties, refusing to reimburse licensing costs, or, indeed, for his alleged observation that the office needed a janitor.[16] The other two defendants with influence over Maldonado's employment in 2012 -- Figueroa-Negrón and the mayor -- had both responded quickly to the complaints about Bristol, and no evidence in the record would support a finding that their failure to actively pursue the Facebook perpetrator at the conclusion of the police investigation stemmed from gender-based or retaliatory animus.[17]

We do not minimize the harassment that Maldonado alleges she encountered before, and in the immediate aftermath of, her participation in the investigation that led to Bristol's removal

---

around the same time, she gave Figueroa-Nieves a medical emergencies bag that "she understood he needed . . . for his work."

[16] Maldonado also complains that Rodríguez routinely assigned her to the 11 PM to 7 AM shift in dispatch, making it difficult for her to care for her family and also complete the licensing requirements. She testified that past practice had been to rotate the overnight shifts. However, the work logs submitted by her attorney to the EEOC show Maldonado working a variety of shifts.

[17] As an aside, we question the district court's conclusion that Maldonado's offered evidence was insufficient to permit a reasonable jury to find that the Facebook messages originated from a computer in the EMO. However, that factual finding is of no consequence to our analysis because, as we have explained, the Facebook harassment is time-barred.

from the EMO.  As our discussion demonstrates, however, Maldonado has not met her burden to produce competent evidence showing that any of the work conditions she encountered within the statute of limitations period amounted to harassment on the basis of the improper motivations she alleges.  Accordingly, the district court properly granted summary judgment for defendants on her Title VII hostile environment claim.

**D. Commonwealth Law Claims**

With respect to her claims under Puerto Rico law, Maldonado argues only that the district court erred in dismissing, as time-barred, the claims brought under Puerto Rico Law 17 and Puerto Rico Law 69.  She asserts that Puerto Rico recognizes the same continuing violation theory that is applicable to her Title VII hostile work environment claim and, hence, the equivalent commonwealth-law claims should be reinstated based on her arguments concerning the federal claim.  Our analysis above thus disposes of these claims as well.

**III. Conclusion**

For the foregoing reasons, we affirm the grant of summary judgment for all defendants on appellant's hostile work environment claims under both federal and Commonwealth law.

So ordered.