# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

December 22, 2021

Lyle W. Cayce
Clerk

No. 21-10299

RealPage, Incorporated,

*Plaintiff—Appellant*,

*versus*

National Union Fire Insurance Company of Pittsburgh, Pennsylvania; Beazley Insurance Company, Incorporated,

*Defendants—Appellees*.

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:19-CV-1350

Before Owen, *Chief Judge*, and Jones and Wilson, *Circuit Judges*.
Cory T. Wilson, *Circuit Judge*:

This case results from a successful phishing expedition. After a RealPage, Inc. employee clicked a fake link in a seemingly innocuous email and provided login information for RealPage's account with Stripe, Inc., a third party payment processor, phishers stole the login credentials. They then used them to divert millions of dollars in rent payments from tenants intended for RealPage's property manager clients. RealPage and Stripe recovered some of the stolen funds but lost about $6 million to the phishing

No. 21-10299

crooks. RealPage reimbursed its clients and filed claims under its commercial crime insurance policies for the stolen funds. But its primary insurer denied coverage, determining the pfished funds were not covered losses because RealPage never "held" them. RealPage then filed this action challenging the denial of coverage. The district court agreed with RealPage's insurer and granted summary judgment. Because we agree that RealPage never "held" the diverted funds, we AFFIRM.

## I.

RealPage partners with online payment processors to collect rent from tenants and route those payments to property management companies. Basically, using an online platform maintained by RealPage, tenants and property managers submit bank account and credit card information. RealPage, except for some accounts it handles directly, then transmits this payment information to third party processors, like Stripe, which process rent payments according to the instructions RealPage provides.

The accounts at issue in this case were generally handled as follows: Stripe, using the information submitted by tenants, withdrew funds from tenants' bank or credit card accounts and deposited the funds into Stripe's Wells Fargo bank accounts. Stripe kept a small percentage of the funds for itself as transaction fees, designated a slightly larger percentage for RealPage as its transaction fees, and then, within a few days of the tenant drafts, transmitted the balance to individual property managers' bank accounts. These transactions were in accordance with the information and instructions sent to Stripe by RealPage.

In April 2018, a RealPage employee received an email purportedly from Stripe. The employee clicked on a fake link embedded in the email and entered login credentials used to access the fund disbursement information RealPage provided to Stripe. In doing so, RealPage's employee took the bait

2

from criminal phishers hook, line, and sinker, unwittingly providing the phishers a giant catch. Using the stolen credentials, the criminals changed RealPage's payment instructions and prompted Stripe to disburse over $10 million designated for RealPage and its property manager clients to other bank accounts.

RealPage and Stripe were alerted to the fraudulent activity and were able to reverse some of the disbursements. Meanwhile, RealPage directly reimbursed its property manager clients whose funds were stolen. Ultimately, despite their efforts, RealPage and Stripe were unable to recover roughly $6 million. As a result, RealPage filed loss claims under the $5 million commercial crime insurance policy it maintained through National Union Fire Insurance Company and the $5 million excess fidelity and crime policy it maintained through Beazley Insurance Company.

The National Union policy limits coverage to "property: (1) [t]hat [RealPage] own[ed] or lease[d]; or (2) . . . h[e]ld for others whether or not [RealPage] [was] legally liable for the loss of such property." Based on this policy language, National Union determined that RealPage owned the funds that Stripe had earmarked as RealPage's transaction fees and provided coverage for that loss, which totaled $1,067,560.73. However, National Union determined that RealPage neither owned nor leased the funds designated for its property manager clients and that Stripe held those funds, not RealPage. Consequently, National Union denied coverage for those unrecouped funds. Because the excess policy written by Beazley only provides coverage once the underlying $5 million National Union policy has been "exhausted by the actual payment of loss(es)," Beazley also denied coverage.

RealPage sued National Union and Beazley in federal court (1) seeking a declaration that both policies cover the stolen funds designated for the

property managers, (2) alleging breach of contract against National Union and Beazley, and (3) alleging various violations of Texas insurance law. After discovery, the parties filed cross-motions for summary judgment.

National Union maintained that RealPage did not own, lease, or hold the funds designated for the property managers, and therefore the loss of those funds was not covered by its policy. RealPage conceded it did not own or lease the funds but asserted that because it controlled Stripe's disbursement of the funds, RealPage ultimately held the funds. Construing the insurance policy's text, the district court agreed with National Union. The court determined that RealPage never possessed the funds intended for the property managers and thus did not "hold" those funds. Because RealPage did not hold the funds, the court concluded the policy did not cover their theft. Based on its interpretation of the National Union policy, the court determined National Union and Beazley properly denied coverage, and it granted summary judgment for the insurers on RealPage's claims.

RealPage now appeals.

## II.

"This court reviews a grant of summary judgment de novo, applying the same standard as the district court." *Luminant Mining Co. v. PakeyBey*, 14 F.4th 375, 379 (5th Cir. 2021) (internal quotation marks omitted) (quoting *Renfroe v. Parker*, 974 F.3d 594, 599 (5th Cir. 2020)). "Summary judgment is merited when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)).

### A.

In this diversity case, "Texas law governs our interpretation of the [p]olic[ies]" at issue. *Cooper Indus., Ltd. v. Nat'l Union Fire Ins. Co.*, 876 F.3d

119, 128 (5th Cir. 2017). In Texas, "[t]he interpretation of an insurance policy, like other contracts, begins with the text, and requires that undefined words be given their plain, ordinary, and generally accepted meanings absent some indication of a different intent." *U.S. Metals, Inc. v. Liberty Mut. Grp., Inc.*, 490 S.W.3d 20, 23 (Tex. 2015) (citations omitted). We read policy terms "in context and in [the] light of the rules of grammar and common usage." *Anadarko Petroleum Corp. v. Hous. Cas. Co.*, 573 S.W.3d 187, 192 (Tex. 2019) (quoting *RSUI Indem. Co. v. The Lynd Co.*, 466 S.W.3d 113, 118 (Tex. 2015)). "To determine a term's common, ordinary meaning, we typically look first to dictionary definitions and then consider the term's usage in other authorities." *Id.* (citing *Tex. State Bd. of Exam'rs of Marriage & Family Therapists v. Tex. Med. Ass'n*, 511 S.W.3d 28, 35 (Tex. 2017)).

RealPage's commercial crime policy issued by National Union covers losses from employee theft, forgery, alteration, theft of money and securities, robbery, safe burglary, computer fraud, and funds transfer fraud. Recovery under the policy is conditioned on several factors. Specifically, subsection (p) of the policy's Conditions states that:

> The property covered under this policy is limited to property:
> (1) That you own or lease; or
> (2) That you hold for others whether or not you are legally liable for the loss of such property.

RealPage does not contend that it owned or leased the money that was designated for its property manager clients, so its claim for coverage turns on the meaning of "hold," used as a verb in the above coverage limitation. Because "hold" is used in the context of the policy language as a third category distinct from but related to "own" and "lease," "hold" must have some relationship to those other terms. *Cf. Anadarko Petroleum Corp.*, 573 S.W.3d at 192 (citing *RSUI Indem. Co.*, 466 S.W.3d at 118; *Tex. State Bd. of Exam'rs of Marriage & Family Therapists*, 511 S.W.3d at 35).

No. 21-10299

"[L]ook[ing] first to dictionary definitions," *id.*, Black's Law Dictionary offers seven definitions of the verb "hold," only four of which possibly pertain to "holding" the funds at issue:

> 1. To possess by a lawful title <Sarah holds the account as her separate property> . . . . 4. To keep in custody or under an obligation <I will ask the judge to hold you accountable>. 5. To take or have an estate from another; to have an estate on condition of paying rent or performing service <James holds Hungerstream Manor under lease> . . . . 7. To possess or occupy; to be in possession and administration of <Jones holds the office of treasurer>.

*Hold*, BLACK'S LAW DICTIONARY (11th ed. 2019). And because this court must "give effect to all of the words and provisions [of a policy] so that none is rendered meaningless[,]" *RSUI Indem. Co.*, 466 S.W.3d at 118 (citations omitted), any definition of "hold" that merges it with "own" or "lease" must be rejected. To "own" is to "rightfully have or possess as property; to have legal title to." *Own*, BLACK'S LAW DICTIONARY (11th ed. 2019). To "lease" is "[t]o grant the possession and use of (land, buildings, rooms, movable property, etc.) to another in return for rent or other consideration[.]" *Lease*, BLACK'S LAW DICTIONARY (11th ed. 2019). Judging from Black's, then, the only definitions of "hold" reasonably applicable in the instant context are "[t]o keep in custody or under an obligation," and, similarly, "[t]o possess or occupy[.]" Neither helps RealPage's case because RealPage never possessed (or kept in its custody) the funds at issue.

RealPage does not maintain that it ever had possession of the funds disbursed by Stripe. And, to be clear, it did not. The transactions between tenants, Stripe, and RealPage's property manager clients were structured so that once the tenants entered their bank or credit card account information into RealPage's online portal, RealPage transmitted that information to

Stripe for processing and did not save it.  RealPage's stated desire was to "protect the credit card information and bank account information that the renters were providing by not having it."  When it came time for a tenant to pay rent, Stripe drafted funds directly from the tenant's account.  Likewise, once a tenant's funds were deposited in Stripe's accounts, Stripe disbursed the funds to the appropriate property manager.  Beyond providing tenants' and property managers' account information, RealPage had no further involvement.  In other words, when money changed hands, RealPage's fingers never touched it.

Essentially, RealPage provided routing instructions to Stripe, and Stripe effectuated the transactions and handled the funds transferred from tenants to property managers.  Under any definition of "hold" that entails "keep[ing] in custody" or "possession," RealPage cannot claim a loss under National Union's policy because RealPage never "held" the funds intended for its property manager clients.

RealPage posits that "control," rather than "possession," is the proper definition of "hold" as used in the National Union policy.  To the extent both definitions could apply, RealPage also contends that "hold" is ambiguous, such that this court should construe its meaning strictly against National Union.  *See, e.g.*, *Glover*, 545 S.W.2d at 761 ("[W]hen the language of an insurance contract is ambiguous . . . then that construction which affords coverage will be the one adopted.").  But the text of a policy is "ambiguous only if it is subject to more than one reasonable interpretation and not merely because the parties or other courts differ over its interpretation."  *U.S. Metals, Inc.*, 490 S.W.3d at 24 (citing *RSUI Indem. Co.*, 466 S.W. 3d at 119; *Grain Dealers Mut. Ins. Co. v. McKee*, 93 S.W.2d 455, 458 (Tex. 1997)).

We do not discern the ambiguity RealPage sees. RealPage's alternate definition for "hold," constructed from an amalgam of selective dictionary definitions, only gains currency if divorced from the context in which "hold" is used in the policy at issue. Moreover, RealPage's proposed dictionary definitions that actually relate to holding property ultimately distill to *possessing* the property, not merely being able to direct someone else to do something with it. *See, e.g.*, *Hold*, https://www.merriam-webster.com/dictionary/hold (last visited Oct. 11, 2021) (defining "hold" as "to *have possession or ownership of or* have at one's disposal[]"; emphasis added to show language omitted by RealPage in its briefing); *Hold*, https://dictionary.cambridge.org/us/dictionary/english/hold (last visited Oct. 11, 2021) (similarly defining "hold"). RealPage's dictionary citations are thus more consistent with the Black's definitions quoted above than they are in either showing that "hold" equates to "control" or that the term is ambiguous.

Accepting *arguendo* RealPage's conflation of "hold" with "control," the record demonstrates that RealPage ultimately did not control the funds designated for the property managers. All funds processed through Stripe were deposited "in pooled clearing accounts" at Wells Fargo. These were Stripe's accounts, not RealPage's. In fact, Stripe's services agreement with RealPage expressly provides that RealPage had "no rights to the Clearing Accounts or to any funds held in the Clearing Accounts[.]" RealPage was "not entitled to draw funds from the Clearing Accounts[,]" and Stripe reserved the right to impose conditions on the release of any funds. While Stripe handled the funds as RealPage directed, Stripe, not RealPage, ultimately controlled the funds in Stripe's custody—demonstrated by the very fact that RealPage could do nothing to recover the stolen funds without Stripe's help, as RealPage conceded at oral argument.

To recap, RealPage never possessed its property manager clients' funds that got caught in the phishers' net. And, crediting RealPage's argument that it could nonetheless "hold" the funds without "possessing" them, RealPage did not control the lost funds either, notwithstanding the routing instructions it provided to Stripe. We thus agree with the district court that RealPage never held the funds, as "hold" is used in the National Union policy.

## B.

RealPage offers two alternative theories to argue that it "held" the funds: a bailment theory and an agency theory. First, RealPage asserts that it held the funds in bailment for the property managers. In Texas, to establish a bailment, "there must be (1) delivery of personal property from one person, the bailor, to another, the bailee, for a specific purpose; (2) acceptance of delivery by the bailee; (3) an express or implied contract between the parties that the specific purpose will be realized; and (4) an agreement between the parties that the property will be either returned to the bailor or dealt with according to the bailor's direction." *State v. $281,420.00*, 312 S.W.3d 547, 551 (Tex. 2010) (citing *Cessna Aircraft Co. v. Aircraft Network, LLC*, 213 S.W.3d 455, 462–63 (Tex. App. 2006); *Int'l Freight Forwarding, Inc. v. Am. Flange*, 993 S.W.2d 262, 263 (Tex. App. 1999)).

RealPage's bailment theory readily falters because, as discussed above, RealPage never had possession of any funds. Because no property was ever delivered to RealPage, and consequently RealPage never accepted delivery of any property, no bailment could have existed. *Id.* (citing *Cessna Aircraft Co.*, 213 S.W.3d at 462–63; *Int'l Freight Forwarding, Inc.*, 993 S.W.2d at 263).

Second, RealPage asserts that Stripe acted as its agent for the purposes of receiving and disbursing the funds at issue. But RealPage has failed to

demonstrate that an agency relationship existed between it and Stripe. To the contrary, Stripe's services agreement explicitly disclaims any agency relationship between RealPage and Stripe. Setting aside this explicit disclaimer, under Texas law, RealPage still must prove that it had the right "(1) to assign the agent's task; and (2) to control the means and details of the process by which the agent will accomplish that task." *Happy Indus. Corp. v. Am. Specialties, Inc.*, 983 S.W.2d 844, 852 (Tex. App. 1998) (citing *Johnson v. Owens*, 629 S.W.2d 465, 468 (Tex. App. 1982)). Nothing in the record demonstrates RealPage had any control over Stripe's payment processes beyond giving Stripe routing instructions for the funds at issue. Accordingly, RealPage's agency argument also fails.

## III.

Because RealPage never held the funds at issue, National Union was within its rights to deny coverage of the stolen funds intended for RealPage's property manager clients. And because National Union's coverage was not exhausted, Beazley was also within its rights to deny coverage under RealPage's excess policy. This holding is "sufficient to preclude coverage," such that this court "need not consider the parties' remaining contentions." *Cooper Indus., Ltd.*, 876 F.3d at 129 (citing *Shamloo v. Miss. State Bd. of Trs. of Insts. of Higher Learning*, 620 F.2d 516, 524 (5th Cir. 1980)). Finally, because RealPage is not entitled to coverage under the policies at issue, its arguments that National Union breached Chapter 541 and 542 of the Texas Insurance Code by not timely paying its claims are similarly without merit. The district court's summary judgment is

AFFIRMED.