# United States Court of Appeals
## For the First Circuit

No. 19-1268

MARK BRADER,

Plaintiff, Appellant,

v.

BIOGEN INC.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

Before

Lynch, Lipez, and Thompson,
Circuit Judges.

Jeremy Y. Weltman, with whom Matthew F. Renna and Hermes, Netburn, O'Connor & Spearing P.C. were on brief, for appellant.
Jonathan R. Shank, with whom Jeffrey S. Brody and Jackson Lewis P.C. were on brief, for appellee.

December 18, 2020

**THOMPSON**, **Circuit Judge**.  Plaintiff-appellant Dr. Mark Brader appeals the district court's award of summary judgment to his former employer, defendant-appellee Biogen, Inc., on his claims of disability discrimination and retaliation in violation of the Americans with Disabilities Act, 42 U.S.C. §§ 12101-12213 (2009) ("ADA"), and its Massachusetts analog, Mass. Gen. Laws ch. 151B, § 4 ("Chapter 151B").[1]  Relevant to the instant appeal, the district court found that certain alleged discriminatory treatment Brader experienced during his employment fell outside the applicable statute of limitations and no equitable exceptions to the limitations period applied.  See Brader v. Biogen Inc., 362 F. Supp. 3d 25, 38-40 (D. Mass. 2019).  After whittling the timeline of alleged actionable conduct to events that occurred within the limitations period, the district court concluded, as is relevant to our work on appeal, that the undisputed material facts did not raise a reasonable inference of employment discrimination under federal or state law.  Seeing no reversible error, we affirm.

## I.  GETTING OUR FACTUAL BEARINGS

We rehearse the facts in the light most favorable to Brader (the nonmovant), resolving all reasonable inferences in his favor, consistent with record support.  See Maldonado-Cátala v.

---

[1]  The district court also dismissed Brader's state common law claim for negligent infliction of emotional distress.  Brader is not challenging this aspect of the district court's summary judgment ruling on appeal.

Municipality of Naranjito, 876 F.3d 1, 4, 8 (1st Cir. 2017) (citing Alfano v. Lynch, 847 F.3d 71, 74 (1st Cir. 2017)); Murray v. Warren Pumps, LLC, 821 F.3d 77, 82 (1st Cir. 2016) (citing Henry v. United Bank, 686 F.3d 50, 54 (1st Cir. 2012)). As a full-throated telling of Brader's factual assertions is necessary to understanding his claims on appeal and our resolution thereof, we beg the reader's patience as we plow ahead.

Biogen is a pharmaceutical company that develops, markets, and manufactures therapies for people living with serious neurological, autoimmune, and rare diseases. Biogen's employees are governed by the company's Values in Action Code of Business Conduct, Non-Discrimination and Non-Harassment Policy, and its Americans with Disabilities Act Non-Discrimination and Accommodation Policy, which together memorialize Biogen's commitment to maintaining a harassment, discrimination, and retaliation free work environment.[2]

Brader, a pharmaceutical scientist by trade, worked for Biogen from October 8, 2007 until his termination on November 6, 2015. At all times relevant to this appeal, Brader was employed as a principal scientist within Biogen's Protein Pharmaceutical Development ("PPD") group, i.e., a group that develops new drug

---

[2] Biogen has also implemented a Global Investigations Protocol, which sets forth procedures for reporting, investigating, and disciplining employee misconduct.

candidates for Biogen. Brader reported to Dr. Andrew Weiskopf, one of PPD's directors. Weiskopf, in turn, reported to Jessica Ballinger, the Senior Director responsible for PPD. Ballinger's supervisor, Dr. Alphonse Galdes, served as the Senior Vice President of the Technical Development department.

Nearly seven years into his employment at Biogen, on or around June 30, 2014, Brader experienced what he has described as an "acute mental episode." Because the events leading up to and surrounding Brader's mental health crisis provide the landscape for our review of his claims on appeal, that's where we begin our recap of relevant events.

## A. Brader's June 2014 Presentation and Performance Review

On June 18, 2014, Brader presented his research on "recent advances in the measurement and interpretation of protein conformational stability" at a routine PPD meeting attended by senior management. Brader viewed his presentation as an important opportunity for his career because he believed he was being considered for a mid-year promotion to director in the "June/July [2014] time frame."[3]

---

[3] According to his previous performance evaluations, Brader was considered a "solid" employee, who had made "outstanding contributions" to PPD's advancement of new technologies.

Handwritten notes from Brader's employee file,[4] dated September 2, 2014, suggest that he was on a mid-year "promotion list" compiled on or around June 16, 2014,[5] and that a "promotion meeting" convened by Galdes took place on June 19, 2014 (the day after Brader's presentation).[6]

On the same day as Galdes' promotion meeting, Dr. Mariana Dimitrova (a director in PPD) sent an email to Brader's immediate supervisor, Weiskopf, and PPD's senior director, Ballinger, in which she expressed concerns about Brader's presentation and underlying research. In her email, Dimitrova criticized the accuracy, complexity, and impact of Brader's research, and she suggested that his presentation did not align with PPD's vision,

---

[4] The handwritten notes were penned by Andrea Sinclair (PPD's designated HR professional at the time) during a conversation with PPD senior management prior to Brader's return to work after medical leave (which we'll discuss in detail later).

[5] The record does not indicate who composed the promotion list, nor does it contain the identities of other PPD employees who, like Brader, were being considered for a mid-year promotion.

[6] The record does not divulge any information about Galdes' agenda for the meeting or the meeting's other attendees. The record also does not indicate whether Galdes (or anyone else) made a decision regarding Brader's mid-year promotion prospects on that day. At best, Biogen asserts (and Brader disputes) that PPD senior management, including Galdes and Ballinger, decided not to promote Brader at some point after his PPD presentation on June 18, 2014 and prior to his acute mental health episode on or around June 30, 2014. Ballinger testified that Brader was not promoted during Biogen's mid-year promotion process in 2014 because he had not yet "demonstrated his capability in a director level." The record does not specify whether (or when) Biogen told Brader about its 2014 decision not to promote him.

platform, and "core capabilities." Weiskopf emailed in response that he agreed with "much of" Dimitrova's concerns and promised to "share his thoughts" with Brader during their one-on-one mid-year performance meeting scheduled for the next day.

As planned, Weiskopf and Brader met to discuss the latter's evaluation. During the meeting, Weiskopf leveled criticism at Brader's presentation to PPD. Weiskopf called the presentation "terrible" and denounced the "harmful" and inappropriate "views and agenda" espoused therein. As Brader tells it, Weiskopf did not provide any "constructive" feedback during their hour-long meet-up; instead, he intentionally "taunt[ed]" Brader with "nonsensical" criticism of his presentation. Because Brader felt there was "no good reason" for Weiskopf's harsh critique, he left their meeting feeling confused and upset.

A few days later, on June 24, 2014, Brader emailed Weiskopf to express his concerns about the feedback he had received. Brader stated that he did not understand why Weiskopf had an issue with the "views and agenda" underlying his "clearly technical presentation." Brader also described Weiskopf's feedback as "troubling" and abnormal by Biogen's standards. He then requested another one-on-one meeting with Weiskopf so he could better understand Weiskopf's perspective. Brader noted, in addition, that he would be reaching out to Ballinger (Weiskopf's direct supervisor) for "help" as well. Weiskopf obliged Brader's

- 6 -

meeting request, and the pair agreed to convene again a couple days later.

According to Brader, during the follow-up meeting on June 26, 2014, Weiskopf again called his presentation "terrible" and also "insult[ing]," which Brader believed was "inappropriate." Nevertheless, the next day, Brader thanked Weiskopf via email for meeting with him again and stated that he planned to ask Ballinger for feedback "soon."

Then, on Sunday, June 29, 2014, Brader emailed Weiskopf again, seeking "a few minutes" of his time in order to resolve what Brader described as the "feedback matter." Weiskopf suggested that Brader meet him in his office during business hours the next morning. Less than ten minutes after emailing Weiskopf, Brader sent a separate email to Ballinger with the subject line "utmost importance and private." In the body of his email, Brader reported that he and Weiskopf had had a "very robust conversation" about his mid-year performance evaluation, and he asked whether Ballinger was able to meet with him the next day to provide her perspective on Weiskopf's feedback. Brader concluded his email to Ballinger by stating that he could perhaps resolve the "whole 'misunderstanding'" by deploying his "Ghandi"-like conflict management skills.

Several hours later, Brader (coincidentally) ran into Ballinger on a walking path in their shared neighborhood. Brader

and Ballinger paused their respective walks to catch up with one another on life outside of work.  According to Ballinger, as their conversation progressed, she became concerned that something was off about Brader.  Ballinger testified that Brader was uncharacteristically "stressed," "agitated," and "not himself." Later that night, Ballinger responded to Brader's email request for a meeting from earlier that day.  She explained to Brader that she was aware of his discussions with Weiskopf and presumed there was a "big misunderstanding."  She agreed to meet with Brader on Monday, June 30, 2014, and she advised him not to stress about Weiskopf's feedback in the meantime.  Ballinger forwarded her email correspondence with Brader to Weiskopf along with a recommendation that they also meet given Brader's "strangely written" email. Ballinger testified that Brader's odd behavior and email prompted her to alert HR when she returned to work on Monday.

## B.  Brader's Safety Concerns

On Monday morning, June 30, 2014, Brader went to Weiskopf's office as scheduled to rehash his objections to Weiskopf's criticism.  This time around, according to Brader, he demanded that Weiskopf "stop harassing" him and objected to Weiskopf's "inappropriate and untruthful criticism" of his presentation.  Weiskopf purportedly disagreed with Brader's characterization of his conduct and feedback. At some point during the meeting, Brader excused himself and returned a few minutes

later with two colleagues[7] because (pursuant to his deposition testimony) he "didn't feel safe," believing Weiskopf was "deliberately targeting" and humiliating him as part of a "malicious personal issue or vendetta."[8]  Brader also testified that he was concerned for his physical safety because of Weiskopf's "body language," "hostile persona," and unwillingness to change his opinion on Brader's presentation.[9]

Ballinger, as requested, met Brader later that day at a Starbucks on Biogen's campus.[10]  Brader denounced Weiskopf's

---

[7]    At his deposition, Brader identified these colleagues as "Olivia Henderson and Pinky," and he asserted that Biogen knew their identities, but never interviewed them.  As best we can tell, we never hear from these two colleagues in discovery, so the record is silent as to their take on what they observed during this meeting between Brader and Weiskopf and silent as to whether Biogen ever reached out to them.

[8]    Brader testified further that Weiskopf treated him differently than he did other Biogen employees in one-on-one meetings.  When asked to elaborate, Brader stated:  "What was different is that his criticism of me and the issues that he insisted on discussing with me were clearly preposterous and absurd."  In addition, given Weiskopf's perceived "hostile" and irrational attitude during meetings with Brader, Brader surmised that his supervisor was deliberately humiliating and antagonizing him in order to provoke him into an "angry response."

[9]    The record does not indicate whether Weiskopf was deposed and contains no evidence from which we can discern Weiskopf's take on his communications with Brader during the relevant time period.  Regardless, as we have explained, we recite the undisputed material facts in the light most favorable to Brader, the nonmoving party.

[10]    To prepare for her meeting with Brader, Ballinger (unbeknownst to Brader) reached out to Sinclair (PPD's assigned HR professional) for guidance.  According to Ballinger, Sinclair was concerned for Ballinger's safety and advised her against meeting

- 9 -

criticism as having "cross[ed] the line" into harassment territory. He then made a "formal complaint that [Weiskopf's] conduct toward [him] violated Biogen's harassment policy." According to Brader, Ballinger did not seem to be taking his expressed complaint seriously.

Ballinger's account of their meeting differs markedly from Brader's: he appeared, she recalled, "physically agitated" and "fidget[y]," and his speech was "jumbled." Although Ballinger had trouble deciphering what she described as Brader's "word salad," she believed Brader repeatedly said he had safety concerns and great ideas. Ballinger testified, however, that Brader didn't provide any pertinent details about his ideas, safety concerns, or Weiskopf's criticism. Based on the information she received from Brader (to the extent she could discern it), she struggled to understand why he felt unsafe at work.

Toward the end of their hour-long conversation, Brader handed Ballinger a crumpled piece of paper containing his indecipherable handwritten notes. Before they went their separate ways, Ballinger suggested that Brader contact Biogen's Employee Assistance Program ("EAP") regarding his safety concerns and handed him an information sheet about the program's resources.

---

with Brader in person. Sinclair eventually took the lead on crafting Biogen's internal strategy for communicating with and supporting Brader over the next two days.

After their meeting, Ballinger contacted Sinclair to discuss Brader's grievances and her observations about his behavior. Ballinger testified that she was afraid for Brader's wellbeing.

That evening, Brader sent Ballinger, Weiskopf, and Sinclair increasingly incoherent emails in which he expressed his frustration with Weiskopf's feedback, declared that he was not safe at work, and demanded to speak to HR about his concerns as soon as possible. In her responsive email, Ballinger urged Brader to contact the EAP's 24/7 confidential hotline about his safety issues and recommended he work from home the next day. She also noted that HR (i.e., Sinclair) would be reaching out to him directly. In a separate email to Brader, Sinclair proposed that Brader utilize the EAP hotline to speak to someone that night, and she encouraged him to work from home the next day.[11] Sinclair also offered to call Brader again so that she could hear more about what was troubling him.

Working from home late that night and well into the next day, July 1, 2014, Brader sent numerous unintelligible and rambling emails to his colleagues and supervisors, including Galdes (Ballinger's boss), in which he complained about Weiskopf's criticism, stated that he did not feel safe, and revealed his

---

[11] Unbeknownst to Brader, given his behavior, Sinclair, Ballinger, and others requested that security suspend Brader's access to Biogen's campus on July 1, 2014. Campus security also was asked to prevent Brader from entering any Biogen buildings.

- 11 -

burgeoning concerns about his mental health. During a respite from his email campaign, Brader spoke with Sinclair over the phone. Given her role as PPD's HR person, Sinclair was responsible for overseeing HR's response to Brader's safety remonstrations. Brader testified that, at some point in his conversation with Sinclair, he made a "formal complaint of harassment against Dr. Weiskopf" and a complaint against Ballinger for being dismissive of his concerns regarding Weiskopf's harassment. Brader claims he told Sinclair that Weiskopf and Ballinger had violated Biogen's "core values: honesty, integrity and respect for others." Brader says Sinclair refused to acknowledge that he was formally complaining about violations of Biogen policy during their call.

According to Sinclair's contemporaneous handwritten notes from her July 1, 2014 phone conversation with Brader, he implored Sinclair to: (1) send an email to Biogen's CEO; (2) make sure Ballinger spoke to Weiskopf; and (3) survey PPD employees about their experiences in the group.[12] Notwithstanding Brader's assertions during their call, Sinclair testified she was not able to ascertain the basis of Brader's safety-at-work fears. Before

---

[12] Sinclair's notes indicate (without elaboration) that Brader complained about Weiskopf's ineffective feedback and failure to "do the right thing." The notes also say Brader accused Ballinger and Weiskopf of calling him "crazy," and Ballinger and Dimitrova of "kicking a guy when he's down." In addition, as best we can discern from the notes, Brader told Sinclair he had been experiencing mental health issues since at least February 2014.

the end of their conversation, Sinclair encouraged Brader to contact the EAP about his safety worries. Again.

Later that day, Brader's wife called Sinclair to thank her for giving Brader information on Biogen's EAP, and explained that Brader had been hospitalized. Brader began a medical leave of absence from Biogen that day.

On July 7, 2014, from a hospital bed, Brader emailed George Scangos (Biogen's CEO), Weiskopf, Galdes, at least five other Biogen employees, and his wife. The email's subject line was "Oliver and the trouble with Death Stars -email#00." Brader stated in the body of the email that he was scared and needed help escaping a "medium security mental hospital" where he was receiving treatment at the time. Brader also shared his desire to "Fix What's Wrong with PPD." The email made no mention of Weiskopf's inappropriate feedback or Ballinger's alleged failure to take his complaints seriously.

Between June 30 and July 7, 2014, Sinclair, Weiskopf, and Ballinger had several in-person meetings, teleconferences, and email exchanges about how to respond to Brader's safety concerns. In addition, Galdes, unspecified members of Biogen's in-house legal team, and campus security discussed Biogen's strategy for ensuring that Brader did not harm himself or others on Biogen's campus. There is no indication that Biogen initiated a formal internal investigation into Brader's complaints of harassment

- 13 -

against Weiskopf at any point.[13]   When asked whether Biogen's policies required her to conduct an investigation under the circumstances presented, Sinclair testified that Brader's "unique" situation required (at minimum) that HR communicate with Brader's supervisors, the EAP, legal, and campus security (which Sinclair did).[14]

### C.  Brader's Medical Leave:  July 2014 - October 2014

In 2014, Biogen had a procedure in place to handle employee medical leaves that was overseen by a third-party vendor. Such was the case on July 1 when Brader began his leave following the onset of his acute mental health episode.  So, as Biogen tells it, because of this firewall protocol, PPD senior management, including Weiskopf, Ballinger, and Galdes, never received any information from Brader's healthcare providers regarding his medical condition or what caused it.

Biogen's HR department did get one direct update on Brader's health condition after his leave began.  On July 20, 2014,

---

[13]   Sinclair testified that, during the relevant time period, HR personnel were tasked with determining whether to refer an employee's complaint to "employee relations" for an investigation.

[14]   According to Biogen's Non-Discrimination and Non-Harassment Policy, Biogen pledges to "respond promptly to all reported complaints and conduct an investigation in a fair and expeditious manner."  Investigations "may include an interview with the person filing the complaint and with witnesses, if appropriate," as well as an interview with the employee "alleged to have committed the" misconduct.

Brader's wife (unprompted by anyone at Biogen) emailed Sinclair and Weiskopf to pass along Brader's diagnosis and prognosis. She explained the doctors believed he had contracted an "infection" and, consequently, suffered an "acute reaction to the medications" he was prescribed after back surgery in April 2014. Ms. Brader expressed relief that Brader's condition was "temporary."

On September 10, 2014, Brader's healthcare provider completed the Healthcare Provider Disability and Accommodation Questionnaire Biogen sent to the Braders for completion. The provider described Brader's condition as a non-permanent physical or mental impairment that began "following back surgery" in April 2014. When asked to explain Brader's impairment, his provider wrote: "[Brader] currently is limited in his ability to concentrate, focus on tasks, interact confidently [with] co[-]workers." Even so, the provider indicated that Brader would not require any job accommodations upon his return to work and could perform his job with "no restrictions expected." Brader claims that he sent the completed questionnaire to Heather-Lee Brown, an HR professional at Biogen. There is no indication in the record that Brader's supervisors reviewed the questionnaire or learned any information from providers regarding his medical condition at

any time relevant to this appeal or from Brader following his "Death Star" email.

### D. Brader's Return to Biogen in October 2014

In October 2014, Brader returned to work on a part-time schedule (at his request). Brader did not ask for or receive any other accommodation or changes to the conditions of his employment at Biogen upon his return. Accordingly, his position, primary responsibilities, supervisor, and compensation were the same as before. Relevant here, however, Brader learned that a research project he once led in collaboration with Avia Biosystems, Inc. had been reassigned to another team while he was out on leave, and he would not be involved in the project going forward. Moreover, Brader's post-doctoral student had been tasked with taking over at least part of Brader's responsibilities on the Avia project.

Brader's next several months at Biogen (between November 2014 and February 2015) were without incident relevant to this appeal, according to the record. Importantly, Brader does not allege that he was harassed by Weiskopf or felt unsafe at work, nor does he claim he experienced any other discriminatory or retaliatory acts during this time.

### E. The Crystallization Project

By March 2015, Brader was exploring a "crystallization concept" he believed would help accelerate Biogen's drug manufacturing process while reducing production costs. In a March

16, 2015 email, Brader asked Ballinger whether her boss, Galdes, would be willing to "convene a director-level staff meeting" in which he could share "provocative/transformative technology ideas." Ballinger responded by asking Brader to let her and Weiskopf review it first and provide guidance on next steps.

On April 3, 2015, Brader sent an email to Galdes, Ballinger, and others (but not Weiskopf) regarding his desire to lead a conversation on "new innovative possibilities" for protein crystallization. Several days later, on April 7, 2015, Brader emailed Weiskopf and Ballinger seeking their internal support for his "highly novel" crystallization concept. Brader asked that Weiskopf and Ballinger "champion" his research proposal by allowing him to lead a discussion at a "director-level forum" and draft a white paper regarding his research. Weiskopf, in his responsive email, stated that Brader's crystallization concept was "innovati[ve]," but expressed concern with Brader's approach to soliciting support for this research proposal. Weiskopf asked Brader not to share his proposal with senior leaders outside of PPD (as Brader had done on April 3, 2015)[15] until after he and Brader could meet one-on-one.

Brader testified that at some point in April 2015 he complained to Ballinger about Weiskopf's "disingenuous" response

---

[15] Weiskopf purportedly disagreed with Brader's decision to announce his nascent crystallization concept via email to Galdes

to his crystallization concept.  Brader purportedly told Ballinger that Weiskopf had admonished him for "trying too hard" at work and asking too many questions in meetings and presentations.

Anyway, Brader was given the greenlight to present his work on the crystallization concept to directors in Biogen's Strategic Innovation group on June 2, 2015.[16]  By the end of July 2015, Biogen's Strategic Innovation group had expressed interest in helping Brader develop a research strategy for the crystallization concept.  Ballinger though, citing concerns about Biogen's financial stability and the Technical Development department's budget and priorities at the time, advised Brader via email to seek guidance from the business development team before taking additional action on his research proposal.

## F.  Brader's 2015 Mid-year Review

The approach of July 2015 meant it was time for Brader to receive his mid-year, written performance evaluation from Weiskopf.  In it, Weiskopf wrote, as part of his overall assessment of Brader, that Brader's "project goals and results" were on track. He noted, however, that there were documented concerns about Brader's "behavior."  Unidentified peers and stakeholders had

_____

and others without first seeking Weiskopf's or Ballinger's approval.

[16]    Weiskopf was copied on the email invitation to Brader's presentation, but it is not clear from the record whether he attended.

- 18 -

observed Brader being "dismissive" and "confrontational" in response to suggestions and feedback he received in group meetings. In addition, according to his evaluation, although the crystallization concept initially was well-received, Brader was experiencing difficulty moving the project forward due to a "clear disconnect" between his objectives and stakeholders' expectations. Brader testified that Weiskopf's criticism of the crystallization concept was "disingenuous" given Weiskopf's lack of professional expertise on the subject matter, and he also stated that Weiskopf's criticism owed to "professional jealousy" and "desire to take undue credit" for Brader's work.

On July 31, 2015, Brader, again ascending the corporate food chain, emailed Ballinger to complain about Weiskopf's "performance expectations" and failure to foster a supportive environment; although he did "not question[] the veracity of [Weiskopf's] feedback," he did question Weiskopf's "consistency in communicating and administering clear goals and expectations with metrics of success associated with them." Brader explained that Weiskopf's reasons for criticizing his "poor performance" and "ineffective scientific leadership" were poorly articulated and his expectations for Brader lacked clarity. He asked for Ballinger's help ensuring that Weiskopf was "held accountable for his feedback" and the expectations he set for his reports. Ballinger eventually responded to Brader's email, encouraging him

to work with Weiskopf to find a constructive resolution of their issues "on both sides." Then, in response to an August 11, 2015 email from Brader containing suggestions on how Weiskopf could improve his "managerial effectiveness," both Ballinger and Weiskopf responded, with Weiskopf stating he was "committed to working together with [Brader] to help him be successful and to strengthen [their] working relationship." Additionally, Ballinger met with Brader on September 29, 2015, and listened to his complaints about his 2015 mid-year review, which he described as inaccurate. Brader did not raise harassment or discrimination allegations as the motivator for the "inaccuracies."

## G. Brader's Termination and Aftermath

Meanwhile, back on August 6, 2015, Galdes, as part of Biogen's company-wide reduction-in-force (known internally as Gemstone) received instructions to compile a list of employees to lay off from the Technical Development department.[17] Gemstone was part of a larger internal effort by Biogen to restructure and redefine its priorities as a company. According to Biogen, Gemstone's objectives included: eliminating positions that did

---

[17] Galdes was part of a small team across Biogen's departments that helped coordinate a major restructuring of the company in 2015. The team -- made up of twenty people out of an eight-thousand-person worldwide workforce -- included other senior vice presidents at Biogen and representatives from HR. The record does not indicate who, in particular, directed Galdes to identify employees from his department for termination.

not reflect an investment in Biogen's critical priorities; consolidating duplicative work streams; and redefining employee roles and responsibilities.

By no later than September 9, 2015, Galdes had decided to recommend Brader for termination along with twenty-four other employees from PPD and other groups within the Technical Development department. Brader alleges he was the only principal scientist on the Gemstone list. Galdes testified that, at the time, he believed Brader was an appropriate candidate for the reduction-in-force because Biogen was no longer prioritizing and investing in the "Blue Sky" innovation work that Brader was responsible for in PPD.[18] Moreover, based on his conversations with Brader and his understanding of Biogen's priorities post-restructure, Galdes believed that Brader's exploration of novel methodologies for protein crystallization was "speculative and would take a long time to prove." For similar reasons, Galdes also decided to include Brader's post-doctoral research student in the upcoming layoffs. In reaching this decision to terminate Brader, says Galdes, one that was his alone for the PPD group, he

---

[18] Pursuant to Brader's self-reporting on his 2015 mid-year evaluation, new technology advancement and innovation represented 15% of Brader's work, and, as Brader described it, his remaining responsibilities were divided up as follows: support Biogen's existing "subvisible particle" projects (35%); supervise post-doctoral student (25%); manage external technology projects and collaborations (15%); and provide biophysical support for existing products (10%).

did not consult Weiskopf and Ballinger or inform them of his decision until it was being implemented.[19]  He also testified he did not consider Brader's "health issue" in June 2014 in reaching his decision.  He was not aware that Brader had (or has) an ongoing mental health issue.[20]

In October 2015, Biogen laid off approximately 11% of its workforce (approximately 880 employees) as part of the Gemstone restructuring.  Brader learned that he would be part of the reduction-in-force on October 22, 2015.  When his employment ended on November 5, 2015, Brader filed a written complaint of workplace "bullying" and "retaliation" with Biogen's HR department.

After Brader's termination, Biogen continued to work on protein crystallization, and Brader's workstream was assigned to an employee who Brader says spent approximately 20% of his time on the project.  Then, three months after Brader left Biogen, Biogen advertised new positions seeking candidates with crystallization experience to serve as either a senior engineer or a post-doctoral

---

[19]    Because Galdes initially considered adding Ballinger to the Gemstone list, it was especially important for him to keep her in the dark on the process.  Ultimately, Galdes decided to transition Ballinger into a different role (as opposed to terminating her).

[20]    Galdes testified he was aware Brader had experienced a "health issue" in late June and early July 2014.  However, Sinclair told him in early July (based on information from Ms. Brader) that Brader's behavior was caused by "meningitis" resulting from Brader's surgery in April 2014.  Galdes therefore believed Brader's condition in June and July 2014 was temporary.

student.  Brader and Biogen dispute whether Brader was qualified for either of these positions.

On December 23, 2015, Brader filed an employment discrimination and retaliation complaint against Biogen with the Massachusetts Commission Against Discrimination ("MCAD").  After receiving approval from MCAD, Brader filed suit against Biogen in Massachusetts Superior Court on April 7, 2016.  A month later, Biogen removed the case to the U.S. District Court for the District of Massachusetts.  According to the district court's generous reading of Brader's complaint, he alleges (in broad strokes) that Biogen discriminated and retaliated against him because of his disability -- including by failing to promote him, reassigning the Avia project, failing to investigate his complaints, permitting Weiskopf's incessant criticism to go unchecked, and terminating him -- in violation of the ADA and Chapter 151B.

Biogen filed a motion for summary judgment on all claims on October 20, 2017.  The district court favorably assumed for the purpose of its review that Brader was a disabled (or handicapped) person protected under ADA and Chapter 151B during the limitations period.  See Brader, 362 F. Supp. 3d at 42.  The district court reasoned, however, that any discriminatory and/or retaliatory employment practices that Biogen committed prior to "spring of 2015" fell outside the applicable statute of limitations for Brader's claims, and concluded that no equitable exception

applied. Id. at 37. In other words, the district court found Brader's claims were time-barred to the extent they were premised upon alleged conduct that occurred in 2014. When the dust settled on what remained of the record, the district court determined that the undisputed material facts did not raise a reasonable inference that Biogen discriminated or retaliated against Brader because of his disability. Id. at 44-45. This timely appeal ensued.

## II. STANDARD OF REVIEW

Our review of the district court's grant of summary judgment is de novo. See Murray, 821 F.3d at 83 (citing Henry, 686 F.3d at 54). "A moving party is to be spared a trial when there is no genuine issue of any material fact on the record and that party is entitled to judgment as a matter of law." Id. (citing Fed. R. Civ. P. 56(a)). To avoid "the swing of the summary judgment scythe," the nonmoving party must adduce specific facts showing that a trier of fact could reasonably find in his favor. See Mulvihill v. Top-Flite Golf Co., 335 F.3d 15, 19 (1st Cir. 2003). The nonmovant cannot rely on "conclusory allegations, improbable inferences, and unsupported speculation." Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990).

## III. DISCUSSION

Brader is appealing the district court's grant of summary judgment against his ADA and Chapter 151B claims. As best we can discern, Brader advances two distinct disability-based

- 24 -

discrimination claims: (A) a discriminatory discharge claim alleging that Biogen wrongfully terminated Brader on the basis of his disability, with Biogen's stated reasons for the termination being pretextual; and (B) a claim of disability harassment under a hostile work environment theory alleging a pattern of adverse employment actions taken against him that, in the aggregate, constituted a hostile work environment that culminated in and included his eventual termination.[21]

---

[21] To the extent Brader is asking us to consider a challenge that he suffered retaliatory action for having reported disability-based discrimination to HR and his supervisors, we put an end to that notion right off the analytical bat: Brader has not identified or developed an argument regarding any missteps underlying the district court's dismissal of that claim.

To have made a retaliation case, Brader would have needed to prove: "(1) []he engaged in protected conduct; (2) []he was subjected to an adverse employment action; and (3) the adverse employment action is causally linked to the protected conduct." Rivera-Rivera v. Medina & Medina, Inc., 898 F.3d 77, 94 (1st Cir. 2018) (citing Noviello v. City of Boston, 398 F.3d 76, 88 (1st Cir. 2005)). The district court explained that even if Brader had established protected conduct (and it wasn't sure he had), he had failed to present any evidence to demonstrate the requisite causal connection between that conduct and his termination. Brader, 362 F. Supp. 3d at 44-45. Now on appeal, Brader still doesn't point to any evidence that would close this loop or demonstrate how the district court erred in concluding otherwise. Brader drops mentions of "retaliation" in his brief but does nothing more to advance developed argumentation on that claim. See Rodríguez v. Municipality of San Juan, 659 F.3d 168, 175-76 (1st Cir. 2011) (deeming waived arguments offered with no citations or analysis, explaining, "[s]ure, he uses some buzzwords and insists that the judge stumbled in ruling on these claims[, b]ut he provides neither the necessary caselaw nor reasoned analysis to show that he is right about any of this"); United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (urging that litigants are required to develop their own arguments rather than "leaving the court to do counsel's work").

And as to those claims, after careful review of the record, we conclude the district court did not err in determining Brader's discrimination charges fail. Before we lay out the specifics of Brader's discrimination claims, a few preliminary basics of the ADA -- and Chapter 151B, the Massachusetts analog law -- are helpful for context. "The ADA prohibits an employer from discriminating against an otherwise qualified individual based on a real or perceived disability." Murray, 821 F.3d at 83 (citing 42 U.S.C. §§ 12112, 12102; 29 C.F.R. § 1630.2). When a plaintiff brings suit advancing ADA claims, he or she "bears the burden of presenting evidence to establish each element under the particular theory of disability discrimination alleged." Id. For its part, Massachusetts has similar prescriptions.[22] See Mass.

---

[22] Specifically, the Massachusetts antidiscrimination statute makes it unlawful for employers to "refuse to hire, rehire or advance in employment or otherwise discriminate against, because of his handicap, any person alleging to be a qualified handicapped person . . . ." Mass. Gen. Laws ch. 151B, § 4(16). The statutory definitions of "disability" under federal law and "handicap" under Massachusetts law are virtually identical. Compare 42 U.S.C. § 12102(2) (defining "disability," in relevant part, as "a physical or mental impairment that substantially limits one or more major life activities of such individual") with Mass. Gen. Laws ch. 151B, § 1(17) (defining "handicap" as "a physical or mental impairment which substantially limits one or more major life activities"). The Massachusetts Supreme Judicial Court ("SJC") consistently applies federal law in evaluating disability discrimination and retaliation claims. Cherkaoui v. City of Quincy, 877 F.3d 14, 24 (1st Cir. 2017).

Notwithstanding similarities in the statutes' text, we have recognized that the SJC has on occasion underscored the critical distinctions between Chapter 151B and the ADA. See, e.g., Dahill v. Police Dep't of Bos., 748 N.E.2d 956, 963–64 (Mass. 2001)

- 26 -

Gen. Laws ch. 151B, § 4(16); see also Murray, 821 F.3d at 83 (collecting cases). In addressing Brader's appellate arguments, we evaluate the ADA claims alongside the state-law claims (our assessments of Brader's federal and state-law claims often overlap). Cherkaoui, 877 F.3d at 24 (applying federal case law in a discrimination case where "material differences" between the ADA and Chapter 151B were not relevant to the plaintiff's claims); see also Murray, 821 F.3d at 83.

## A. Wrongful Discharge Discrimination Claim

Brader claims that Biogen terminated him because of his disability, and Biogen's stated reasoning for the termination is pure pretext designed to mask its discriminatory animus. Because Brader has not proffered direct evidence of a discriminatory discharge, we invoke the familiar three-step burden-shifting scheme outlined in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-07 (1973). "At the first stage of this framework, the appellant bears the burden of showing a prima facie case of discrimination." Miceli v. JetBlue Airways Corp., 914 F.3d 73, 81 (1st Cir. 2019) (citing Gannon v. City of Boston, 73 N.E.3d 748, 756 (Mass. 2017)). Here the prima facie case requires a showing that Brader has a disability; that he was "nonetheless qualified

_____

(declining to adopt federal jurisprudence in evaluating Chapter 151B disability discrimination claim concerning a "correctable" impairment). But Brader does not identify any such critical distinctions relevant to our review of the instant appeal.

- 27 -

to perform the essential functions of the job, with or without reasonable accommodation; and that, despite the foregoing," Biogen discharged him. Id. (citing Verdrager v. Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., 50 N.E.3d 778, 793 (Mass. 2016)). At step two in the analysis, the burden of production shifts to Biogen, which must proffer a legitimate reason for terminating Brader. See Lockridge v. Univ. of Me. Sys., 597 F.3d 464, 470 (1st Cir. 2010). Biogen's proffered reason must be one "which, on its face, would justify a conclusion that the plaintiff was let go for a nondiscriminatory motive." Dávila v. Corporación De P.R. Para La Difusión Pública, 498 F.3d 9, 16 (1st Cir. 2007). If Biogen provides such a reason in this case, "the McDonnell Douglas framework disappears and the sole remaining issue is discrimination vel non." Ray v. Ropes & Gray LLP, 799 F.3d 99, 113 (1st Cir. 2015) (quoting Cham v. Station Operators, Inc., 685 F.3d 87, 93 (1st Cir. 2012)). To avoid the summary judgment scythe at step three of the analysis, Brader must "show by a preponderance of the evidence that [Biogen's] proffered reason is pretextual and that the actual reason for the adverse employment action is discriminatory." Johnson v. Univ. of P.R., 714 F.3d 48, 54 (1st Cir. 2013) (citing Lockridge, 597 F.3d at 470).

Although we proceed with caution and restraint when considering summary judgment motions where, as here, issues of motive and intent must be resolved, see Oliver v. Digital Equip.

<u>Corp.</u>, 846 F.2d 103, 109 (1st Cir. 1988), the nonmoving party must proffer more than "conclusory allegations, improbable inferences, and unsupported speculation" for his claims to survive, <u>Coll</u> v. <u>PB Diagnostic Sys., Inc.</u>, 50 F.3d 1115, 1121 (1st Cir. 1995) (quoting <u>Medina-Muñoz</u>, 896 F.2d at 8).

We assume favorably to Brader that he established a prima facie case of disability discrimination (in shorthand -- disabled, qualified, discharged) in violation of the ADA and Chapter 151B, thereby surmounting step one of the <u>McDonnell Douglas</u> framework.

Turning to step two, the burden of production shifts to Biogen to articulate a legitimate, nondiscriminatory reason for terminating Brader in November 2015. On appeal, Brader says Biogen fell short on this requirement, while Biogen contends that it met its burden by demonstrating that it terminated Brader as part of a company-wide reduction-in-force that impacted 11% of its employees. For support, Biogen relies upon the deposition testimony of Galdes (the sole decisionmaker responsible for Brader's termination) in which he clearly explained that he selected Brader because Biogen was no longer prioritizing the "Blue Sky" innovation work on which Brader primarily focused. We agree with Biogen -- this evidentiary proffer was sufficient to allow a jury reasonably to conclude that Biogen's stated reason for terminating Brader was legitimate.

With that, the burden of production shifts back to Brader to prove Biogen's stated reason for terminating him is pretextual. To meet his step-three burden, Brader "must offer 'some minimally sufficient evidence, direct or indirect, both of pretext and of [Biogen's] discriminatory animus.'" Pearson v. Mass. Bay Transp. Auth., 723 F.3d 36, 40 (1st Cir. 2013) (quoting Acevedo-Parrilla v. Novartis Ex-Lax, Inc., 696 F.3d 128, 140 (1st Cir. 2012)). "[M]ere questions regarding [Biogen's] business judgment are insufficient to raise a triable issue as to pretext." Id. (first alteration in original) (quoting Acevedo-Parrilla, 696 F.3d at 140) (affirming grant of summary judgment when employer's "merely questionable behavior" did not constitute minimally sufficient evidence of pretext). But "[p]retext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." Adamson v. Walgreens Co., 750 F.3d 73, 79 (1st Cir. 2014) (quoting Gómez–González v. Rural Opportunities Inc., 626 F.3d 654, 662-63 (1st Cir. 2010)). "[I]n assessing pretext, [our] focus must be on the perception of the decisionmaker, that is, whether the employer believed its stated reason to be credible." Vélez v. Thermo King de P.R., Inc., 585 F.3d 441, 452 (1st Cir. 2009) (quoting Azimi v.

- 30 -

Jordan's Meats, Inc., 456 F.3d 228, 246 (1st Cir. 2006)) ("We understand that it is not enough for a plaintiff merely to impugn the veracity of the employer's justification; [s]he must elucidate specific facts which would enable a jury to find that the reason given is not only a sham, but a sham intended to cover up the employer's real and unlawful motive of discrimination." (internal quotation marks and brackets omitted)).

Here, as his proffered evidence of pretext, Brader points to perceived inconsistencies between Biogen's reasons for terminating him and its actions after he was laid off, such as the record evidence indicating that Biogen continued to develop his novel crystallization concept after he was terminated and that, three months after Brader's departure, Biogen posted two positions for an engineer and post-doctoral student with crystallization experience. In addition, Brader argues the innovation work that purportedly landed Brader on Galdes' termination list made up only 15% of his job. Brader says in light of these perceived inconsistencies, Biogen's actions are evidence of pretext, and the undisputed material facts cast doubt on the veracity of Biogen's reasoning for terminating him.

Biogen says Brader's pretext argument amounts to nothing more than subjective speculation unsupported by the evidence and can be reduced to Brader's disagreement with Biogen's business rationale for including Brader on the Gemstone list.

Even viewing the record in the light most favorable to Brader, we conclude it is clear that he has not tendered sufficient evidence from which a reasonable jury could infer that discriminatory animus was a motivating factor in his termination as part of Biogen's reduction-in-force.

Much of Brader's argument takes aim at the fact that Biogen advertised two crystallization-experience-required jobs in the wake of his departure -- according to Brader, that shows Biogen still needed Brader's skills. But this take is flawed. For one thing, even if Biogen determined there was no business case for Brader's role on the crystallization project and other innovation-related projects, Biogen's decision to reallocate resources to such projects after Brader's termination, without more, does not raise a reasonable inference of discriminatory animus. See, e.g., Lewis v. City of Boston, 321 F.3d 207, 216 (1st Cir. 2003) ("Merely demonstrating that, as a result of the reduction in force, the employer consolidated positions or allocated duties of discharged employees to other existing employees does not itself raise a reasonable inference that the employer harbored discriminatory animus toward any one employee."). Indeed, Biogen not only underwent a reduction-in-force, but also it undertook an entire rethinking of its business strategy. Plus, we note that Brader was not singled out for inclusion on the Gemstone list, but rather his post-doctoral student also was terminated as part of Biogen's

reduction-in-force and new take on business strategy and company priorities. Where, as here, courts are "faced with employment decisions that lack a clear discriminatory motive," we "'may not sit as super personnel departments, assessing the merits -- or even the rationality -- of employers' nondiscriminatory business decisions.'" Rodríguez-Cardi v. MMM Holdings, Inc., 936 F.3d 40, 48-49 (1st Cir. 2019) (quoting Mesnick v. Gen. Elec. Co., 950 F.3d 816, 826 (1st Cir. 1991)). "We are left, then, with the sort of 'criticisms of [an employer's] decision making process' attendant to a reduction-in-force that 'fail to reveal any hidden animus . . . .'" Dunn v. Trs. of Boston Univ., 761 F.3d 63, 74 (1st Cir. 2014) (alteration in original) (quoting Sullivan v. Liberty Mut. Ins. Co., 825 N.E.2d 522, 542 (Mass. 2005)).

What's more, Galdes testified that the positions posted (a senior manufacturing engineer, not a research scientist; and a temporary co-op student) after his departure were not similar to Brader's position. In fact, there is no evidence that the post-reduction-in-force hiring was geared towards the same type of crystallization work Brader had pursued. And furthermore, Galdes explained, Brader was not qualified for the posted senior engineer position since, to the best of Galdes' knowledge, Brader is not an engineer and has no experience "milling small molecules" (as was required for the senior engineer position). Our review of the record reveals Brader provided no independent, contradictory

- 33 -

evidence from which a jury could reasonably surmise otherwise, i.e., that Biogen's posted positions for a senior engineer and a post-doctoral student were substantially similar to the position Brader held and that he was qualified to fill these positions.  To the extent Brader points to his own declarations of qualifications, he fails to explain why that would be so.

As to Brader's proposition that his innovation work constituted only 15% of his job (so using that part of his job to justify his termination must have been pretextual), this argument is at odds with the record evidence.  Galdes testified that he never saw the 2015 mid-year evaluation breaking down Brader's self-described work percentages, and thus he did not take it into consideration when he concluded Brader would be on the Gemstone list.  Again, Brader points to no evidence which contradicts Galdes' assertions.  And to the extent that Brader believes spending only 15% of his time on this innovative work (as opposed to another Biogen employee devoting 20% of his or her time to the same work) demonstrates a sham justification, this, too, fails to move the evidentiary needle -- all it shows, at most, is that Biogen shuffled allocation of duties amidst the restructuring, and that on its own cannot give rise to an inference of discriminatory animus or pretext.  See Lewis, 321 F.3d at 216.

With respect to Brader's insistence that Galdes not only knew about Brader's disability, but also clearly harbored a

disability-based discriminatory animus that drove him to include Brader on the Gemstone list, yet again, Brader simply hasn't done the evidentiary legwork to show that Galdes considered Brader to be disabled such that a jury could infer Galdes' discriminatory animus prompted him to terminate Brader. Yes, Galdes was Cc'd on some of the emails Brader sent during his mental break, so Galdes was generally aware of the mental health incident Brader experienced in June 2014. But from there, the evidence shows that Brader's wife explained to Sinclair that Brader's mental health incident was only a temporary one -- a message she passed along to Galdes in July 2014 -- and there is nothing in the record to show Galdes believed it was not temporary. Plus, Brader never held himself out as disabled upon his return to work, nor did he make any mention of an ongoing disability or request accommodation for a disability. So there is no evidence that Galdes considered Brader to be disabled, rather than believing the mental health issue was temporary, and Galdes, as the appellate record supports, didn't take that temporary mental health issue into account when he made his termination decision. Furthermore, Galdes testified that he consulted with neither Weiskopf nor Ballinger (recall operation Gemstone was the well-kept secret of twenty Biogen employees worldwide) regarding his decision to terminate Brader (such that he might have learned about any potential ongoing disability issues that way), and there's no evidence to suggest

otherwise. Remember: as sole decisionmaker, Galdes is our focus.
See, e.g., Vélez, 585 F.3d at 452 (emphasizing that a reviewing
court's focus is on the decisionmaker's perception, i.e., whether
that decisionmaker thought the stated reason for a given employment
action was a credible one). There's simply nothing to go on here
that would allow a factfinder to infer discriminatory animus as
driving Galdes' decision-making.

In the end, Brader's arguments simply fail. Of course
he's not wrong that it is a "factfinder's job to . . . weigh the
evidence," but it is axiomatic that his case would not reach a
jury unless he first showed "some minimally sufficient evidence"
of pretext and a discriminatory animus, and trying to raise a
triable issue on the topic of pretext cannot be accomplished by
advancing "[m]ere questions" focusing on Biogen's "business
judgment." Pearson, 723 F.3d at 40 (quoting Acevedo-Parrilla, 696
F.3d at 140). Brader cannot just "impugn the veracity of
[Biogen]'s justification" -- he needed to point us to "'specific
facts which would enable a jury to find that the reason given is
not only a sham, but a sham intended to cover up [Biogen]'s real
[and unlawful] motive' of discrimination." Azimi, 456 F.3d at 246
(third alteration in original) (quoting Mesnick, 950 F.2d at 824);
see also Vélez, 585 F.3d at 452.

Brader has not successfully navigated these
fundamentals. Rather, Brader's efforts to demonstrate pretext can

be reduced to subjective disagreements with Biogen's business judgment relative to its reduction-in-force decisions. Without a supportable discriminatory motive in the record, as we wrote earlier, we "may not sit as super personnel departments, assessing the merits -- or even the rationality -- of employers' nondiscriminatory business decisions." Rodríguez-Cardi, 936 F.3d at 48-49 (quoting Mesnick, 950 F.2d at 825). Brader has given us only "the sort of 'criticisms of [an employer's] decision making process' attendant to a reduction-in-force that 'fail to reveal any hidden animus.'" Dunn, 761 F.3d at 74 (quoting Sullivan, 825 N.E.2d at 542). Overall, since Brader did not proffer evidence from which a reasonable jury could infer that Galdes (and, by extension, Biogen) harbored discriminatory animus against him, he has not satisfied his burden of production as to pretext under the McDonnell Douglas framework.

Meanwhile, Brader's Chapter 151B claims are also subject to the McDonnell Douglas burden-shifting framework, Ray, 799 F.3d at 113 n.8, with one applicable distinction; "Massachusetts is a pretext only jurisdiction," Bulwer v. Mount Auburn Hosp., 46 N.E.3d 24, 33 (Mass. 2016) (quoting Blare v. Husky Injection Molding Sys. Boston, Inc., 646 N.E.2d 111, 116 (Mass. 1995)), so a plaintiff, to survive summary judgment, "need only present evidence from which a reasonable jury could infer that 'the [employer's] facially proper reasons given for its action against him were not the real

- 37 -

reasons for that action,'" id. (quoting Wheelock Coll. v. Mass. Comm'n Against Discrimination, 355 N.E.2d 309, 315 (Mass. 1976)).[23] For the reasons just explained, Brader's proffered evidence of pretext does not satisfy this burden.

### B.  Brader's Disability Harassment Claim: A Hostile Work Environment

That leaves Brader's other disability discrimination claim -- he was harassed based on his disability in violation of the ADA and Chapter 151B by virtue of the hostile work environment he was forced to endure, and which led to and included his eventual termination.  As we'll explain shortly, Brader points in part to some untimely conduct to support this claim.  And so, in the analysis that follows, we assess the interplay between his efforts to sidestep statute-of-limitations issues and his hostile work environment claim.  See Morgan, 536 U.S. at 120 ("[A] court's task is to determine whether the acts about which an employee complains are part of the same actionable hostile work environment practice, and if so, whether any act falls within the statutory time period.").

We have said that a plaintiff may demonstrate an ADA violation by establishing that an employer required him or her to

-----

[23]    In other words, Massachusetts law differs from federal law in that plaintiffs do not need to establish both discriminatory animus and pretext; they just need to show pretext.  See Bulwer, 46 N.E.3d at 33.

work in a hostile or abusive environment on account of their disability. See Murray, 821 F.3d at 86 and n.1 (collecting cases and generally recognizing disability-based hostile work environment claims under the ADA). To successfully make out this hostile work environment claim, "a plaintiff must show harassment 'sufficiently severe or pervasive so as to alter the conditions of [his] employment and create an abusive work environment.'" Maldonado-Cátala, 876 F.3d at 10 (quoting Pérez-Cordero v. Wal-Mart P.R., Inc., 656 F.3d 19, 27 (1st Cir. 2011)). "The challenged conduct must be 'both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the plaintiff in fact did perceive it to be so.'" Id. (quoting Pérez-Cordero, 656 F.3d at 27). We are mindful that we "must mull the totality of the circumstances, including factors such as the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfere[d] with an employee's work performance.'" Id. (quoting Noviello, 398 F.3d at 92); see also Faragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1998); O'Rourke v. City of Providence, 235 F.3d 713, 729 (1st Cir. 2001).

Critically, "[t]he harassment also must stem from an impermissible motivation." Maldonado-Cátala, 876 F.3d at 10; see also id. at 10 n.11 (citing Ponte v. Steelcase Inc., 741 F.3d 310,

320 (1st Cir. 2014)); Murray, 821 F.3d at 86; Quiles-Quiles v. Henderson, 439 F.3d 1, 7-8 (1st Cir. 2006) (explaining that "an employee claiming harassment must demonstrate that the hostile conduct was directed at him because of a characteristic protected by a federal anti-discrimination statute"). We remind, a plaintiff like Brader "bears the burden of presenting evidence to establish each element under the particular theory" alleged under the ADA. Murray, 821 F.3d at 83. And our role in all of this is to determine if the plaintiff has put forth sufficient evidence "to distinguish between the ordinary, if occasionally unpleasant, vicissitudes of the workplace and actual harassment." Noviello, 398 F.3d at 92.

In Massachusetts, the continuing violation doctrine can apply to Chapter 151B claims if a plaintiff establishes that "at least one discriminatory act occurred" within the 300-day limitations period; the alleged discriminatory act must have a "substantial relationship to the alleged untimely discriminatory acts"; and the earlier violations were such that they "did not trigger [the plaintiff's] awareness and duty to assert his rights." Ocean Spray Cranberries, Inc., 808 N.E.2d at 266-67.

The general principles laid out, we now turn to a critical procedural stumbling block which impedes Brader's claims -- the statute of limitations -- since whether and how Brader surmounts this obstacle dictates our analysis of his hostile work

environment claim.[24]  Both the ADA and Chapter 151B instruct that plaintiffs (like Brader) may "maintain a civil action only if [they] have filed a timely complaint with the Massachusetts Commission Against Discrimination."  Christo v. Edward G. Boyle Ins. Agency, Inc., 525 N.E.2d 643, 644 (Mass. 1988) (citing Mass. Gen. Laws ch. 151B, § 9).  Chapter 151B requires that an MCAD complaint be filed within 300 days of the alleged unlawful employment practice.  See Mass. Gen. Laws ch. 151B, § 5.  Here, the 300-day limitations period applies to Brader's federal and state-law discrimination claims.  Brader doesn't dispute this, nor does he contest the district court's conclusion that the alleged discriminatory acts committed by Biogen in 2014, viewed in isolation, are time-barred.  With that, he concedes that certain of the alleged adverse actions (failure to promote, removal from the Avia project, Weiskopf's 2014 criticism, and HR's failure to investigate) are not actionable on their own under the ADA or Chapter 151B.  See Morgan, 536 U.S. at 109 (explaining that any

---

[24]    There are other procedural requirements, too -- for example, before bringing claims under the ADA, Brader needed to (and did) first "file an administrative claim with the EEOC or with a parallel state agency before a civil action may be brought." Thornton v. United Parcel Serv., Inc., 587 F.3d 27, 31 (1st Cir. 2009); see Rivera-Diaz v. Humana Ins. of P.R., Inc., 748 F.3d 387, 389 (1st Cir. 2014) (citing 42 U.S.C. §§ 12117(a); 12203(a)) (explaining that the procedural requirements for filing suit under the ADA are set forth in Title VII of the Civil Rights Act). Administrative exhaustion is "a prerequisite to the commencement of suit" under the ADA.  Bonilla v. Muebles J.J. Alvarez, Inc., 194 F.3d 275, 277 (1st Cir. 1999).

unlawful but untimely employment practice will not be actionable on its own).  We explain, all the while mindful of the important "base-line rule . . . that time limitations are important in discrimination cases, and that federal courts therefore should employ equitable tolling sparingly."  Bonilla, 194 F.3d at 278; see also Morgan, 536 U.S. at 113-14 (quoting Baldwin Cty. Welcome Ctr. v. Brown, 466 U.S. 143, 152 (1984) (per curiam) ("Procedural requirements established by Congress for gaining access to the federal courts are not to be disregarded by courts out of a vague sympathy for particular litigants.")).

In trying to persuade us the statute of limitations does not slam the door on certain claims, Brader directs us to the continuing violation doctrine, which provides that "a plaintiff may obtain recovery for discriminatory acts that otherwise would be time-barred so long as a related act [(often called an 'anchoring act')] fell within the limitations period." Maldonado-Cátala, 876 F.3d at 9 (quoting Tobin v. Liberty Mut. Ins. Co., 553 F.3d 121, 130 (1st Cir. 2009)); see also Quality Cleaning Prod. R.C., Inc. v. SCA Tissue N. Am., LLC, 794 F.3d 200, 205 (1st Cir. 2015) (observing that, "[a]s long as a related act falls within the limitations period, the doctrine allows a lawsuit to be delayed in cases -- such as hostile work environment claims -- in which a course of 'repeated conduct' is necessary before 'a series of wrongful acts blossoms into an injury on which suit can be

brought'" (quoting <u>Ayala</u> v. <u>Shinseki</u>, 780 F.3d 52, 57 (1st Cir. 2015)); <u>see also</u> <u>Noviello</u>, 398 F.3d at 86 (observing that the related "anchoring act" must "substantially relate[] to earlier [untimely] incidents of abuse"). So a litigant who wants the continuing violation doctrine to apply to untimely conduct must establish a timely and related anchoring act to which the untimely conduct can be tethered.

We've described hostile work environment claims "as the classic example of a continuing violation," <u>Maldonado- Cátala</u>, 876 F.3d at 9, since they "cannot be said to occur on any particular day" because "the actionable wrong is the environment, not the individual acts that, taken together, create the environment," <u>Tobin</u>, 553 F.3d at 130 (quoting <u>Ledbetter</u> v. <u>Goodyear Tire & Rubber Co.</u>, 550 U.S. 618, 638 (2007), <u>overturned by statute</u> (Jan. 29, 2009)). <u>See</u> <u>Morgan</u>, 536 U.S. at 117 (observing that "the entire hostile work environment encompasses a single unlawful employment practice"). "[A]ll of the 'component acts' alleged in a hostile work environment claim may be considered in determining liability even if they occurred outside the limitations period." <u>Maldonado-Cátala</u>, 876 F.3d at 9. In truth, this equitable doctrine is not really "about a <u>continuing</u> [violation], but about a <u>cumulative</u> violation." <u>Quality Cleaning</u>, 794 F.3d at 205 (emphases added) (quoting <u>Limestone Dev. Corp.</u> v. <u>Vill. of Lemont, Ill.</u>, 520 F.3d

797, 801 (7th Cir. 2008) (Posner, J.)).[25]

Here's the bird's-eye view of how these principles converge for our analytical purposes: most of Brader's complained-of conduct will be "off limits unless [he] can surmount the time-bar for actions that occurred" in 2014 since, as we just explained, we can consider Biogen's alleged 2014 behavior "only if at least one of the incidents that occurred" during the limitations period (an anchoring act) "constitutes part of the same hostile work environment as the alleged wrongful conduct that preceded that date." Maldonado-Cátala, 876 F.3d at 10.

Brader points to a pattern of adverse employment actions by Biogen, or, as he calls it, the "pinprick after pinprick" that added up to the "cumulative effect" of "intolerable work conditions": Biogen's failure to promote him, its decision to remove him from the Avia project,[26] its failure to investigate his safety and harassment complaints in violation of internal policy,

---

[25]    Indeed, the idea of it being a "continuing violation" is quite the misnomer since "unlawful discrimination . . . is often a cumulative process rather than a one-time event discrimination" -- "[t]he first instance of . . . offensive words or actions may be too trivial to count as actionable harassment, but if they continue they may eventually reach that level and then the entire series is actionable." Limestone, 520 F.3d at 801 (citing Morgan, 536 U.S. at 117).

[26]    In his brief, Brader acknowledges that as a practical matter, the reassignment of the Avia project was a reasonable move given Brader's absence. But ultimately, he views his removal as part of a grander Biogen scheme to get rid of him because of his disability.

Weiskopf's ongoing harassment, and his eventual termination in 2015. To Brader's thinking, a jury could reasonably view Biogen's "hostile," discriminatory conduct as part of a "linked," "prolonged and compelling pattern of mistreatment" constituting one employment practice, all of which was substantially related to his discrimination-fueled termination. Indeed, all of these component acts, says Brader, added up to a hostile work environment that culminated in his wrongful discharge.

Here, to support his hostile work environment claim, Brader complains about two categories of timely, anchoring, abusive conduct driven by disability-based discriminatory animus towards him: (1) Weiskopf's criticisms and alleged harassment in 2015; and (2) Brader's November 2015 termination. But our careful review of the record tells us that this conduct lacks evidentiary support that would permit a jury to conclude either that the alleged anchoring acts are substantially related to the prior incidents Brader complains of (i.e., that the conduct was part of a pattern), Noviello, 398 F.3d at 86, or that it constituted "'severe or pervasive' harassment that 'alter[ed] the conditions of his employment and create[d] an abusive work environment' extending into the relevant time period," Maldonado-Cátala, 876 F.3d at 11 (quoting Pérez-Cordero, 656 F.3d at 27), or that the alleged anchoring-act harassment "stem[med] from an impermissible motivation," id. at 10, i.e., that Brader was subjected to this

"hostile conduct" because of his disability, Quiles-Quiles, 439 F.3d at 7-8.

Take Brader's claims regarding Weiskopf and the role he is alleged to have played in creating the hostile work environment Brader alleges. The timely 2015 Weiskopf conduct at issue involves (1) Weiskopf's criticism of Brader's crystallization project and (2) his overseeing of Brader's mid-year review. The evidence Brader relies on to support his harassment claim on this front comes from his deposition testimony regarding his 2015 interactions with Weiskopf. Brader testified that Weiskopf had a disingenuous response to Brader's crystallization proposal, rebuked him for asking too many questions in meetings, and failed to set clear expectations for Brader in advance of the 2015 mid-year review.

For starters, Brader's generic complaints about Weiskopf's criticisms and his effectiveness as a supervisor do not rise to the level of "sufficiently severe or pervasive so as to alter the conditions of [his] employment." Maldonado-Cátala, 876 F.3d at 10 (quoting Pérez-Cordero, 656 F.3d at 27). While we do not doubt Brader felt harassed, even as we look to the "totality of the circumstances," Brader offers no evidence as to how, exactly, any of Weiskopf's behavior actually constituted harassment in that it impacted his working conditions in such a way that could be reasonably viewed by a jury as being carried out

in a severe or pervasive fashion.  See id.  For example, consider Weiskopf's criticism of Brader's crystallization project, which Brader says Weiskopf lacked the expertise to judge.  Importantly, Brader, at the time the criticism was leveled, pegged Weiskopf's negative critique not on disability animus but on professional jealousy or Weiskopf's desire to take undue credit for Brader's work.  But even Weiskopf's criticism was tempered with praise; he acknowledged Brader's concept as innovative.  Brader fails to explain why Weiskopf taking issue with Brader's methods of soliciting support for his new project or his request that Brader not share the concept outside of PPD until Weiskopf and Brader discussed it one-on-one could be reasonably viewed as harassment.  Same goes for Weiskopf's purported admonitions to Brader for asking too many questions in meetings and generally "trying too hard."  Brader has not shown how Weiskopf's conduct here falls outside the boundaries of valid, supervisory critique.  Plus, in the end, Brader got what he wanted -- permission to present his crystallization project.  So, to repeat, it is entirely unclear how this episode of Weiskopf criticism, alone or in conjunction with the other events complained of, could objectively constitute harassment or how it impacted Brader's work conditions.

The same is true of Weiskopf and the 2015 performance review installment in this saga.  Brader was upset that his performance review included some unfavorable feedback (recall that

some peers and stakeholders had described Brader being "dismissive" and "confrontational" in response to suggestions and feedback he received in group meetings). But again, Brader hasn't shown us how this amounted to harassment rather than Weiskopf simply doing his job: Brader even seemed to acknowledge as much when, in a meeting he requested to complain about Weiskopf's treatment of him, he told Ballinger he did "not question[] the veracity of [Weiskopf's] feedback," he just took issue with Weiskopf's "consistency in communicating and administering clear goals and expectations with metrics of success associated with them." At no point did Brader express concerns about harassment. So once again, this conduct, alone or in conjunction with other conduct, does not reasonably amount to harassing conduct "sufficiently severe or pervasive so as to alter the conditions of [his] employment." Id.

We similarly fail to see any evidence showing that this conduct is not only subjectively offensive (as Brader says it was), but also objectively so, "such that a reasonable person would find it hostile or abusive." Id. (quoting Pérez-Cordero, 656 F.3d at 27). In fact, yet again, there's no evidence that Weiskopf's alleged harassment of Brader amounted to anything other than Weiskopf levying criticisms and voicing concerns as he performed his duties as a supervisor; rather, at most, these are "minor instances of employment skirmishes" that "cannot ground [Brader]'s

hostile work environment claims." Murray, 821 F. 3d at 87; see also Colón-Fontánez v. Municipality of San Juan, 660 F.3d at 17, 44-45 (1st Cir. 2011) (finding no hostile work environment when complained-of interactions were "brusque and even uncivil," but incidents were episodic rather than frequent, and upsetting but not severe).

All told, Brader simply hasn't adduced sufficient evidence to show that Weiskopf's supervisory behavior amounted to anything other than that: a supervisor doing the "appropriate and necessary duties of [his] job[]." Murray, 821 F. 3d at 87.

And if all that wasn't enough, Brader has fallen short on a different but critical aspect of what he needed to show to square this so-called Weiskopf "harassment" away as anchoring conduct: "the [alleged] harassment also must stem from an impermissible motivation." Maldonado-Cátala, 876 F.3d at 10. But Brader does not connect any evidentiary dots as to how Weiskopf's conduct tends to show Weiskopf harbored any disability-based discriminatory animus whatsoever towards Brader. For instance, Brader does not direct us to competent record evidence of the kind we sometimes see in other employment discrimination claims of Weiskopf hurling disability-based invectives at Brader, see, e.g., Murray, 821 F.3d at 87 (pointing to evidence of a variety of snide comments, such as "a younger person could do the task very easily," in an effort to support disability harassment claim); Quiles-

Quiles, 439 F.3d at 4 (proffering evidence that, among other things, supervisors called the appellant "'crazy' on a daily basis" and "'joked' . . . about the fact that [appellant] saw a psychiatrist and took medication for his condition"), nor does he argue that Weiskopf is guilty of such ubiquitous, disability-driven attacks in support of his harassment claim.

As for Weiskopf's management style to which Brader took offense, keep in mind, as Brader tells it, Weiskopf was ill-tempered towards Brader before he showed any signs of a mental disability:  recall Weiskopf's harsh critique of Brader's June 18, 2014 PPD presentation to senior management predated any evidence of manifestations of Brader's mental health issue.  We have consistently acknowledged in similar employment dispute cases that "[t]oiling under a boss who is tough, insensitive, unfair, or unreasonable can be burdensome," but even to the extent Weiskopf fit this bill, Brader hasn't shown that he behaved that way due to discriminatory animus -- and "generally disagreeable behavior and discriminatory animus are two different things."  Ahern v. Shinseki, 629 F.3d 49, 59 (1st Cir. 2010); see also Noviello, 398 F.3d at 92 (emphasizing our court's role in distinguishing "between the ordinary, if occasionally unpleasant, vicissitudes of the workplace and actual harassment").

So, in sum, Brader has not proffered minimally sufficient evidence from which a jury could infer that his alleged

harassment by Weiskopf was so severe or pervasive that it altered his work conditions and fostered an abusive environment in the limitations period, nor did he adduce evidence showing that the harassment owed to an impermissible motivation.  Murray, 821 F.3d at 83, 86; Maldonado-Cátala, 876 F.3d at 10.  These showings not made, the conduct cannot anchor the untimely conduct Brader wants us to consider under the continuing violation doctrine as part of his hostile work environment claim.

That sorted, we turn to the remaining limitations period conduct that Brader wants to deem the anchoring hostile work environment conduct such that he can use the continuing violation doctrine to sweep the untimely acts up into his claim:  his November 2015 termination.

We know from our earlier wrongful termination discussion that Biogen articulated what we concluded were legitimate, non-discriminatory reasons for including Brader in the reduction-in-force.  In the hostile work environment claim, though, Brader says his termination takes on a different role as the final (timely) act of harassment that is "substantially related" to all the other component acts of his hostile work environment (failure to investigate, Weiskopf's 2014 harassment, and so on).

Remember Brader's burden here:  we can consider the

untimely misbehavior by Biogen only if the termination,[27] as the anchoring act, is indeed substantially related to the other conduct, "constitut[ing] part of the same hostile work environment as the alleged wrongful conduct that preceded" it, and if it "stem[med] from an impermissible motivation," Maldonado-Cátala, 876 F.3d at 10, i.e., the "conduct [(his termination)] was directed at him because of" his disability, Quiles-Quiles, 439 F.3d at 7-8.

Putting aside the requirement that the termination must be shown to be part of the same pattern constituting a hostile work environment as the 2014 instances of misconduct by Biogen (and we're not convinced Brader has shown any of those instances to be at all related either to his termination or shown any of those instances to be related to one another), our earlier wrongful discharge analysis dispensed with Brader's position that he has offered sufficient evidence to show that his termination (a decision made by an independent actor without consulting others, remember) owed to and "stem[med] from" the disability-related discriminatory animus he says it did. Maldonado-Cátala, 876 F.3d at 10; Quiles-Quiles, 439 F.3d at 7-8. As such, the termination cannot serve as an anchoring act for the untimely conduct, meaning the continuing violation doctrine is not in play here either, and

---

[27] No one disputes that Brader's termination altered the conditions of his employment.

- 52 -

we cannot consider the untimely conduct.  We need say no more.

In winding down our analysis, we stress that our jurisprudence identifies that "'[t]he accumulated effect' of behaviors that individually fall short may, taken together, constitute a hostile work environment."  Maldonado-Cátala, 876 F.3d at 12 (quoting O'Rourke, 235 F.3d at 729).  But to sway us on this "accumulated effect" phenomenon, Brader needed to show not only that the timely behavior contributed to a hostile work environment, but also that the timely harassment was driven by some impermissible motivation (here, disability-related discriminatory animus).  See, e.g., id. at 10.  Brader hasn't proffered sufficient evidence to permit a finding that any of this timely conduct was part of a hostile work environment stemming from disability-related discriminatory animus.  And indeed, because Brader (the nonmoving party) carries the burden of persuasion on his claims, he needed to martial "'specific facts, in suitable evidentiary form,' sufficient to limn a trialworthy issue."  Lawton v. State Mut. Life Assur. Co. of Am., 101 F.3d 218, 223 (1st Cir. 1996) (quoting Morris v. Govt. Dev. Bank, 27 F.3d 746, 748 (1st Cir. 1994)).  Failure to do so "allows the summary judgment engine to operate at full throttle."  Id.  The intended goal of summary judgment "is to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required."  Id. at 222 (quoting Wynne v.

Tufts Univ. Sch. of Med., 976 F.2d 791, 794 (1st Cir. 1992)). So it is here: Brader has not met his burden to produce competent evidence showing that the timely 2015 work conditions he faced amounted to harassment on the basis of the improper motivations he alleges. Id. at 223.

## IV. WRAP UP

That, as they say, is that. The district court appropriately concluded that Brader had not produced sufficient evidence to survive summary judgment on his claims. We **affirm** its grant of summary judgment against Brader. Each side will bear its own costs.